# CHARLESTON.

CRUMLISH v. RAILROAD CO.

and

FIDELITY CO. v. SAME.

*(GREEN, JUDGE, absent.)

Submitted February 8, 1889.—Decided February 25, 1889.

1. CONTRACTS—PRESUMPTION OF LAW—BURDEN OF PROOF—CORPORATIONS.

Where the contract of a corporation purports to be sealed with its corporate seal,"and it is proven to be signed by the proper agents of the corporation, the presumption is that the seal was affixed by the proper authority, and such contract will be held valid until the contrary is shown. (p. 257.)

2. CONTRACTS—PRESUMPTION OF LAW — CORPORATIONS— DIRECTORS.

The presumption of authority to affix the corporate seal to a contract will not be overcome by the mere fact, that no vote of the directors authorizing it is shown. (p. 257.)

3. NOTICE—TRUSTS AND TRUSTEES—RAILROAD CO.—MORTGAGE.

Notice to a trustee is notice to the cestui que trust; and this rule applies to trustees under an ordinary mortgage made by a railroad company to secure the holders of bonds issued under it. (p. 259.)

*On account of illness.

4. Notice—Purchasers.

Where a subsequent purchaser has actual notice that the property in question was incumbered or affected, he is charged constructively with notice of all the facts and instruments, to the knowledge of which he would have been led by an inquiry into the incumbrance or other circumstance affecting the property, of which he had notice.  (p. 259.)

5. Mortgage—Release.

An entry of satisfaction by the mortgagee, after he has parted with his interest in the security, will not discharge the mortgage in favor of one who had acquired an interest in the land before the discharge was made.  (p. 260.)

6. Mortgage—Trusts and Trustees—Release.

A mortgage is executed by a railroad company on its property to secure bonds to be issued thereunder, which provides, that upon the full payment of all said bonds at maturity the trustee shall release the same.  Before the maturity of the bonds, they are surrendered to the trustee upon an agreement, that other bonds to be issued under a subsequent mortgage are to be substituted for them.  The trustee without substituting such other bond executed a release of the mortgage, stating therein that all the bonds "had been surrendered."  The railroad company was not in a condition to anticipate the payment of its bonds, and had executed several other mortgages to take up bonds issued under former mortgages.  *Held:* These facts and circumstances were sufficient to charge a subsequent mortgagee with notice of the terms and conditions, upon which the bonds under said released-mortgage had been surrendered, and he takes subject to the rights of those entitled to the bonds under said agreement.   (p. 260 *et seq.*)

7. Trusts and Trustees.

The trustee can only do with the trust-property what the deed either in express terms or by necessary implication authorizes him to do.  (pp. 264, 5.)

8. Mortgage—Release—Evidence—Cancellation.

The cancellation of a mortgage on the record is only *prima facie* evidence of its discharge, and the owner may prove that the cancellation was done by fraud, accident or mistake, and, if he does this, his rights will not be affected by the improper cancellation of it.  (p. 266.)

9. Mortgage—Railroad Co.—Intervention—Ch'y Practice.

Where the road of a railroad company passes into two states, in each of which it is a domestic corporation, and the trustee in a mortgage upon the whole road first brings a suit in one state to foreclose the mortgage and afterwards brings an ancillary suit in the other state for the same purpose, the plaintiff in said suits can not object to or prevent a lien-creditor of the railroad company, who has not filed his claim in the first suit, from intervening in the second to establish his lien.  (p. 271.)

*McDonald & Moore* and *D. B. Lucas* for appellants.

*W. H. Travers, W. J. Robertson, J. C. Bullett, G. B. Caldwell* and *F. P. Clark* for appellees.

Snyder, President:

Appeals from two decrees of the Circuit Court of Jefferson county,—one pronounced November 29, 1887, in the suit of J. Garland Hurst, administrator of H. H. Crumlish, deceased, suing on behalf of himself and all other stockholders of the Central Improvement Company, against the Shenandoah Valley Railroad Company ; and the other pronounced September 11, 1888, in the suit of the Fidelity Insurance, Trust & Safe-Deposit Company, trustee,' against the said Shenandoah Valley Railroad Company. As the record is voluminous and the facts complicated, an understanding of the questions to be determined may be facilitated by first giving a brief statement of some of the prominent facts appearing in the record.

The Shenandoah Valley Railroad Company was organized in May, 1870, under Acts of the Legislatures of the States of Virginia, West Virginia and Maryland for the purpose of constructing and operating a railroad ; and the road, as constructed by it, now extends from Hagerstown in the state of Maryland through Jefferson county in West Virginia to the city of Roanoke in the State of Virginia. The Central Improvement Company was organized in July, 1870, under an Act of the Legislature of the State of Pennsylvania passed April 9, 1870, for the purpose of constructing any work public or private and for other purposes. Three written contracts were entered into between the said improvement and railroad companies, designated as contracts Nos. 1, 2, and 3.

No 1, dated August 9, 1870, was for the construction of the railroad by said improvement company from Sheperdstown to Big Lick (now Roanoke city) a distance of 233 miles, the work to be completed by August 10, 1872, at the price of $35,000.00 per mile of track laid, payable in first and second mortgage-bonds of the said railroad company and certain county-bonds, as the work progressed.

No. 2, dated August 1, 1872, was practically a substitute for No. 1, and provided for the construction of the railroad

from Shepherdstown to Waynesboro, a distance of only 140 miles, and fixed October 1, 1874, as the time for the completion of the work.

No. 3, dated April 23, 1873, was supplemental to contract No. 2 and conferred upon the improvement company the power to vote a large amount of the stock of said railroad company.

On October 15, 1872, the said railroad company executed to J. Edgar Thompson, trustee, a first-mortgage on its road and franchises between Shepherdstown and Waynesboro, to secure $3,750,000.00 of first-mortgage 7 *per cent.* gold bonds, being $25,000.00 per mile of the road. During the month of September, 1873, $781,000.00 of these bonds were issued and delivered to said improvement company on account of its contracts for the construction of said railroad; and of these bonds $250,000.00 were subsequently delivered by the improvement company to the Pennsylvania Railroad Company as collateral security for loans made by the latter to the improvement company, leaving in the hands of the improvement company the balance of $531,000.00 of said bonds. On January 7, 1873, a resolution was passed by the stockholders of the improvement company authorizing its president and treasurer to dispose of the securities receivable under its contract with the said railroad company. Work on the railroad was abandoned by the improvement company in the fall of 1873, and never afterwards resumed by it.

Jefferson county on behalf of itself and other stockholders of the Shenandoah Valley Railroad Company in April, 1874, filed its bill in the Circuit Court of Clarke county, Va., to set aside the aforesaid contracts, Nos. 1, 2, and 3, between the said railroad company and the improvement company. A final decree was entered in this suit on December 8, 1874, whereby said contracts Nos. 2 and 3 were set aside and declared void; but the court refused to set aside contract No. 1.

In December, 1876, an attachment suit in equity was brought in the Circuit Court of Warren county Va., by J. T. Griffith suing in the name of H. H. Crumlish for his use against the Central Improvement Company and the Shenandoah Valley Railroad Company to attach, whatever stock might be held by the improvement company in the said rail-

road company, and any indebtedness due from the latter to the former, to satisfy a debt due to the plaintiff from the said improvement company on account of work done for the latter in the construction of said railroad. The suit was afterwards transferred to the Circuit Court of Clarke county and referred to a commissioner, who made a report holding, that the $781,000.00 of bonds aforesaid had been delivered by the railroad company to the improvement company under the said contracts Nos. 2 and 3, which had been set aside and declared void in the aforesaid Jefferson county suit, and that the said delivery was void. In December, 1878, an amended bill was filed by Griffith, in which he averred, that the said bonds had been delivered under said contract No. 2, which had been declared void, and consequently the said delivery was without authority and void, and the debt, which these bonds had been transferred to pay, was still a subsisting debt due from the said railroad company to the improvement company, and liable to the plaintiff's attachment. In January, 1880, Griffith on behalf of himself and the other creditors of the improvement company, who had by petition made themselves plaintiffs, filed a petition in the suit, in which it is averred "that all these bonds thus issued ($781,000.00) have been returned and cancelled, and the mortgage securing them has been released, and they have been substituted by a like number of bonds issued under a second mortgage, recorded, for $15,000.00 per mile."

On May 18, 1880, the court entered a decree in favor of the plaintiff, Griffith, against the Central Improvement Company for $8,826.33, and ordered the sale of 5,000 shares of stock of the Shenandoah Valley Railroad Company, held by the improvement company, at the time the attachment was sued out by Griffith, to pay said sum ; and the court being of opinion, that the improvement company had subject to the lien of the attachment of Griffith and before the filing of the petition and amended bill making the general creditors parties made a valid assignment of the said stock to the Pennsylvania Railroad Company, it denied the relief prayed for by the general creditors, and the amended bill, so far as it asked relief in their behalf, was dismissed.

From this decree and other decrees subsequently rendered

in other suits heard with this suit an appeal was taken to the Supreme Court of Appeals of Virginia; and the said decree of May 18, 1880, was affirmed. *Railroad Co. v. Griffith*, 76 Va. 913.

By an agreement dated April 29, 1878, the said improvement company agreed to surrender to the said railroad company all the first-mortgage bonds held by it upon the terms set forth in said agreement. On January 1, 1879, the said railroad company executed a mortgage on its railroad and franchises to the Farmers' Loan & Trust Company to secure $2,250,000.00 of first-mortgage bonds. On August 25, 1879, W. H. Travers, as substituted trustee in the aforesaid mortgage of October 15, 1872, executed a release of said mortgage. The railroad company by a mortgage dated July 1, 1871, but which was in fact executed in September, 1879, and recorded October 6, 1879, conveyed its road and franchises to W. H. Travers, trustee, to secure $1,500,000.00 of second-mortgage bonds; being $10,000.00 per mile on its road from Shepherdstown to Waynesboro. The aforesaid mortgages of July 1, 1871 (1879) and of January 1, 1879, were subsequently released, the former May 6, 1880, and the latter on October 2, 1880. On April 1, 1880, the railroad company executed a mortgage to the plaintiff, The Fidelity Insurance, Trust & Safe-Deposit Company, trustee, on all its property to secure first-mortgage bonds to be issued at the rate of $15,000.00 per mile of completed road, and $10,-000.00 of bonds additional for each mile of double track. On the next day, April 2, 1880, the said railroad company executed to the same trustee on all its property another mortgage to secure second-mortgage bonds at the rate of $10,000.00 per mile of its road. On April 5, 1881, the said railroad company executed to same trustee another mortgage, known as the "General Mortgage," to secure bonds to be issued at a rate not exceeding $25,000.00 per mile of its road. By deed of release, dated July 30, 1881, The Fidelity Insurance, Trust & Safe-Deposit Company released the aforesaid mortgage of April 2, 1880. The railroad company on February 12, 1883, executed another mortgage, known as the "Income Mortgage," on all its property and the income of its road to the defendant The Fidelity Insurance,

Trust & Safe-Deposit Company, trustee, to secure $2,500,-000.00 of income bonds. It will be observed, that of the aforesaid seven mortgages all have been released except the three dated, respectively April 1, 1880, April 5, 1881, and February 12, 1883, to The Fidelity Insurance, Trust & Safe-Deposit Company, trustee.

On December 1, 1882, the administrator of II. II. Crumlish, deceased, brought the first of these suits in the Circuit Court of Jefferson county. The bill alleges that the plaintiff, as administrator of Crumlish, was the owner and holder of two certificates of the paid-up stock of the Central Improvement Company of 100 shares each, of the par value of $50.00 per share; that the paid up capital stock of said company was $150,000.00; that the said company owes debts amounting to about $300,000 00; that in a settlement made in the spring of 1874 it became the owner of $781,000.00 of first-mortgage-bonds of the Shenandoah Valley Railroad Company, and is still the owner of $531,000.00 of said bonds; that in the spring of 1879 these bonds without the authority of said company were destroyed, with the understanding, that they were to be substituted by other bonds to be issued under another mortgage; and, in order to prevent the issue and delivery of said substituted bonds to some unauthorized person, the plaintiff prayed an injunction to inhibit such issue, *etc.* A demurrer to this bill was sustained by the Circuit Court.

An amended bill was filed in April, 1885, in which the plaintiff avers, that since the filing of his original bill he has learned, that the Shenandoah Valley Railroad Company sets up a claim to said $531,000 00 of bonds under an alleged agreement dated April 29, 1878, which is fraudulent and void; and that the mortgage of October 15, 1872, securing said bonds has been improperly released, setting out the facts and grounds, upon which the agreement is alleged to be void and the said mortgage improperly released, and then praying that said agreement and release may be declared ineffectual and void, and the title of said improvement company to said bonds established *etc.* A demurrer to this bill was also sustained by the Circuit Court; but on appeal to

this Court the demurrer was overruled the bill sustained and the cause remanded. *Crumlish* v. *Railroad Co.*, 28 W. Va. 623.

By a decree entered in the cause by the Circuit Court on November 29, 1887, it was decided, that the aforesaid agree-ment of April 29, 1878, did not pass the title to said $531,000.00 of first mortgage-bonds from the improvement company to the Shenandoah Valley Railroad Company; that the amount of the debt evidenced by said bonds is still due from said railroad company to said improvement company; and adjudged and decreed, that said agreement of April 29, 1878, be declared void as between the said companies; and A. W. Mac Donald was appointed receiver of the assets of the said improvement company, and leave given him to prosecute the claim of said company in the suit of The Fidelity Insurance, Trust & Safe-Deposit Company then pending in said court. From this decree the Shenandoah Valley Railroad Company has appealed.

The Fidelity Insurance, Trust & Safe-Deposit Company, trustee, on March 31, 1885, filed its bill against the Shenandoah Valley Railroad Company in the Circuit Court of the city of Roanoke in the state of Virginia, to foreclose the mortgages held by it as aforesaid; and on April 1, 1885, the said Fidelity Company, as trustee, filed its bill in the second of these suits, in the Circuit Court of Jefferson county, as ancillary to the foreclosure suit already brought in Roanoke city, as aforesaid; and Sidney F. Taylor was appointed receiver of said railroad and its property in each of said suits. In February, 1888, A. W. MacDonald, special receiver, filed his petition in this cause exhibiting therewith the record of the aforesaid suit of Crumlish's administrator against the Shenandoah Valley Railroad Company, averring that he was a necessary party to this suit by reason of the aforesaid decree of November 29, 1887, in the said Crumlish suit, appointing him receiver to prosecute the claim therein established in favor of the Central Improvement Company against the Shenandoah Valley Railroad Company, which he represented to be the first lien on the property of said company. The said Fidelity Company excepted to the filing of said petition and demurred to the same, and, said excep-

tions and demurrer having been overruled by the court, it filed its answer to said petition, and to the bill and amended bill in said Crumlish suit.

As defences in its answer it denied the right of petitioner to exhibit the record in the Crumlish suit against it in this suit, because it was not a party to that suit; it denied the right of petitioner to intervene in this suit, because it is only an ancillary proceeding to the main suit, which was then pending in the Circuit Court of the city of Roanoke, and insisted, that the improvement company should assert its claim in that suit; it claimed that on a settlement of accounts the improvement company would be shown to be indebted to the Shenandoah Valley Railroad Company; it pleaded and relied on the said agreement of April 29, 1878, as a valid and binding contract between the improvement company and said railroad company; and it also pleaded and relied on the laches of said improvement company as a bar and estoppel to its right to set up its alleged claim in this suit.

The petitioner replied generally to this answer. The administrator of Crumlish having also filed his petition in this cause, he was also made a party, and the Fidelity company made substantially the same objections and answer thereto.

On September 11, 1888, the Circuit Court pronounced a decree, by which it was adjudged and decided, that as between the stockholders and creditors of the Central Improvement Company and the Fidelity Insurance, Trust & Safe-Deposit Company, trustee, representing the holders of the bonds issued under the said mortgages dated respectively April 1, 1880, April 5, 1881, and February 12, 1883, the said The Fidelity Company was and is a purchaser for value without notice, and postponed the payment of the debt of said improvement company to the liens created by said mortgages.

From this decree J. Garland Hurst, administrator of H. H. Crumlish, deceased, and A. W. MacDonald, special receiver for the Central Improvement Company, have appealed.

The first inquiry is whether or not the Circuit Court erred in the decree entered by it on November 29, 1887, in the first

of these causes. It is contended by the appellant, the Shenandoah Valley Railroad Company, as well as by the Fidelity Company, that inasmuch as the contracts, Nos. 2 and 3, under which the first-mortgage-bonds claimed by the Improvement Company were delivered or paid to it by the Shenandoah Valley Railroad Company, were set aside and declared void by the decree of December 8, 1874, of the Circuit Court of Clarke county in the suit of Jefferson county against said Improvement Company, the said company never had any right or title to said bonds.

In the view I take of this cause, it is unnecessary to consider any matter connected with said Jefferson county suit. The record shows that at a meeting of the stockholders of the Central Improvement Company held on January 2, 1873, the following resolution was adopted : " Resolved, that the president and treasurer of this company are hereby authorized and empowered to dispose of the securities receivable by this company under its contract with the Shen. Val. R. R. Co., on such terms as in their judgment may be to the best interests of this company." So far as the minutes of this company show, its stockholders had but three meetings, after this resolution had been passed, and the last of these was held November 4, 1875. At neither of these meetings was the authority conferred by the aforesaid resolution revoked or withdrawn. The records of the improvement company show, that on April 29, 1878, and prior thereto Phillip Collins was the duly-elected and acting president of said company, and C. W. MacKeehan was secretary and treasurer. On said day the following agreement was executed :

" This agreement, made this 29th day of April, A. D. 1878, between the Shenandoah Valley Railroad Company, of the first part, and the Central Improvement Company, of the second part, witnesseth : Whereas, under certain contracts heretofore made with the Shenandoah Valley Railroad Company, the Central Improvement Company agreed to build the said Shenandoah Valley Railroad from Shepherdstown, on the Potomac river, in the state of West Virginia, to a point of connection with the Chesapeake and Ohio Railroad near Staunton, Va., being a distance of about one hundred and thirty three miles; and whereas, under said con-

tracts, a large amount of grading and masonry has been done on the first seventy five miles of the line south of Shepherdstown; and whereas, by reason of the financial panic of 1873, the further construction of said road had ceased up to this time, and it is now the desire of the Shen. Val. R. R. Co. and the Central Improvement Company that the bonds and other securities of the Shenandoah Valley R. R. Co., heretofore paid to the Central Improvement Company, and by it pledged to other parties, shall be retired and canceled, in order that under a new contract with John Satterlee & Co. and Alfred Creveling and the Shenandoah Valley Railroad Company may be carried out for the completion of said road to a connection with the Chesapeake and Ohio Railroad, and in order that the said Central Improvement Company be released from all liability under the contracts above mentioned: Now, therefore, this agreement witnesseth: *First.* That the securities heretofore deposited with the Pennsylvania Railroad Company for the amount advanced to the Central Improvement Company by the Pennsylvania Railroad Company shall be surrendered by said Pennsylvania Railroad Company to said Shenandoah Valley Railroad Company; the Pennsylvania Railroad Company agreeing to receive in exchange therefor, under the terms of an agreement already made between said companies, $250,000.00, of an issue of $500,000.00 six *per cent.* currency second-mortgage bonds of the Shenandoah Valley Railroad Company, subject to a prior lien of $15,000.00 per mile of first-mortgage six *per cent.* bonds which second-mortgage bonds the said Shenandoah Valley Railroad Company agrees to deliver to the said Pennsylvania Railroad Company, under the terms of the agreement herein referred to. *Second.* The Central Improvement Company agrees to deliver to the Shenandoah Valley Railroad Company all the first-mortgage bonds of the Shenandoah Valley Railroad Company held by it which were received under the contracts aforesaid. *Third.* The Shenandoah Valley Railroad Company also agrees to issue and deliver to the Central Improvement Company $250,000.00 of the second-mortgage-bond aforesaid, in full consideration for the delivery and cancellation of the securities referred to. *Fourth,* The Shenandoah Valley Railroad Company also agrees to issue and

deliver to the Central Improvement Company, in payment for the amount received by it from subscribers to its capital stock heretofore expended by said Central Improvement Company in the gradation of the line above mentioned, the amount paid in on the capital stock of the Central Improvement Company, with interest amounting to the sum of ——, six *per cent.* currency income bonds of said Shenandoah Valley Railroad; said bonds to be taken at the rate of fifty cents on the dollar, to be subject only to the first and second mortgage-bonds herein mentioned. Should the Central Improvement Company, or any of the holders of the above-mentioned income bonds paid out under the terms of this contract, elect to have said bonds converted into preferred stock of the Shenandoah Valley Railroad Company, then the Shenandoah Valley Railroad Company agrees to issue said preferred stock upon the written request of the said Central Improvement Company or the holders thereof. *Fifth.* The Shenandoah Valley Railroad Company agrees to release the Central Improvement Company from all damages arising from breach of the contract above-mentioned, and consents that the same shall be declared null and void. *Sixth.* The Central Improvement Company hereby gives its full consent to the delivery by the Pennsylvania Railroad Company, and all other holders of securities herein mentioned, to the Shenandoah Valley Railroad Company, of the securities hereinbefore referred to, and held by the Pennsylvania Railroad Company and others as collateral for advances made from time to time to said Central Improvement Company.

"In witness whereof the parties of the first and second part hereunto have affixed their seals, duly attested, day and year above written.

WILLIAM MILNES, Jr.,

"Pres. Shen. Val. R. R. Co.

[Seal of Shenandoah Valley Railroad Co.]

"PHILLIP COLLINS,

"Pres. Central Improvement Co.

[Seal of Central Improvement Co.]

"Attest: C. W. MacKEEHAN, Secretary Central Improvement Company."

It is proven by C. W. MacKeehan, whose name is signed to said agreement, that Phillip Collins was at the time the president, and that he, MacKeehan, was the secretary and treasurer, and that he and Collins signed and affixed the seal of the company to said agreement for the purpose of executing it; that they fully understood the facts, and regarded the agreement as very satisfactory and beneficial to the improvement company,—to use his language, they thought "that it was a god-send to the improvement company." The records of the company do not show any other express authority to execute this agreement than the aforesaid resolution of January 7, 1873; nor is there any other evidence on the subject. The Shenandoah Valley Railroad Company and The Fidelity Company not only concede, that this agreement was properly and legally executed, but insist, that it is valid and binding upon both the Shenandoah Valley Railroad Company and the improvement company. The only question then is, whether or not the improvement company is bound by this agreement.

It is claimed on behalf of this company, that the aforesaid resolution authorized the president and treasurer to act for it; while this agreement is executed by the president and attested by the secretary, and therefore it is not only not an exercise of the power conferred by the resolution, but it does not purport to be so, and in fact the officers, who executed it, did not intend to act under that resolution. It is proven, that MacKeehan, at the time he executed the agreement, was both secretary and treasurer of the company, and that he did execute it as an officer of the company. In the face of this proof it is immaterial in what form he executed it. It would be extremely technical and, I think, unwarrantable to hold, that a paper duly signed and sealed by the proper officer should be held invalid, simply because he failed to properly add to his signature the proper title of his office, and especially when as in this case the officer held the two offices in the same company. Nor does it seem to me at all material, that the agreement does not refer to the resolution, or that the officers did not intend to execute it under said resolution. The question is not what the officers believed or intended at the time, but what they did, and whether they acted within

the authority conferred upon them, and these questions must be determined solely and entirely by the act or agreement itself.

The rule is well settled : "If a contract purport to be sealed with the seal of a corporation, and it is proven to be signed and executed by the proper agents, the presumption is, that the seal was regularly affixed by the proper authority; and a contract under seal executed by an agent within the scope of his appointed power will be held valid and binding upon the corporation, until evidence to the contrary has been introduced." Aug. & A. Corp. § 224; 2 Mor. Priv. Corp. § 617; *Smith* v. *Smith*, 62 Ill. 493, 497. "The presumption of authority to affix to the instrument the seal of the corporation will not be overcome by the mere fact, that no vote of the directors authorizing it is shown, since it is often the case, that large powers are executed by corporate officers with the tacit approval of the corporation." 1 Wat. Corp. § 96; *Railroad Co.* v. *Bastian*, 15 Md. 494.

It appears in proof, that the stockholders of the improvement company had notice of this agreement as early as July, 1879, and that they acquiesced in it until the filing of the amended bill in this cause in April, 1885. It is true, the plaintiff in this suit avers in his bill, that he did not know, that said agreement had not been properly executed and honestly carried into effect until after he had filed his original bill in December, 1882; but this did not relieve him from the responsibility of acquiescence in said agreement. He had notice of the existence of this agreement and the means of determining its validity, and it was his duty to do so. It is therefore plain under the authorities above cited, that, even if said agreement was executed without express authority from the stockholders or directors of the company, the plaintiff in this suit as well as the improvement company is estopped to question or deny the authority to execute it. *Trader* v. *Jarvis*, 23 W. Va. 108; Field, Corp. § 226 ; Story, Ag. § 255.

This agreement fully explains the condition of the improvement company and the circumstances, under which it was made ; and considering these circumstances it seems to me, that it was not only just but liberal in its provisions in

favor of the improvement company. Its operative provisions deal with two subjects: *First*, the $250,000.00 of bonds, which had been placed with the Pennsylvania Railroad Company as collateral security; and, *second*, the $531,000.00 of bonds, which still belonged to the improvement company. In respect to the latter the improvement company agreed to deliver to the Shenandoah Valley Railroad Company said $531,000.00 of bonds, and the railroad company agrees in consideration thereof to issue and deliver to the improvement company $250,000.00 of second mortgage bonds, out of a total issue of $500,000.00 subject to a first-mortgage of $15,000.00 per mile, and also to issue and deliver to the improvement company income-bonds at the rate of fifty cents on the dollar to an amount equal to the paid-up capital stock of said improvement company, subject to the lien of the aforesaid first and second mortgages, and also to release the improvement company from all damages arising from the breach of the contract, on account of which said $781,000.00 had been delivered to it.

This is the whole purport and effect of said agreement, so far as it relates to said $781,000.00 of bonds. Therefore, whatever may be the fate of the aforesaid contracts, Nos. 1, 2, and 3, and the defects in the title to the bonds originally delivered under the same, there can be no question in regard to the title of the improvement company as to the bonds, which the railroad company bound itself to deliver to said company under the said agreement of April 29, 1878, provided the latter agreement is valid and enforceable. That it is a valid agreement, I think for the reasons and upon the authorities hereinbefore given, there can be no question. But the improvement company contends, that said agreement was executory, and that the railroad company has not only wholly failed to perform it, but that by its subsequent acts and conveyances it has entirely disabled itself to perform it or carry it into execution. Admitting that said agreement is executory, it does not necessarily follow, that it would be inoperative, or that the railroad company by its subsequent acts has disabled itself to perform it or respond in damages for its failure to do so. A simple judgment against the railroad company for damages would probably be worthless and

could not perhaps be considered as a sufficient remedy for its failure to perform said agreement.

The real question presented therefore, it seems to me, is whether or not the railroad company has so disabled itself or changed its condition, that on account of the intervening rights of others there can be neither a specific execution of said agreement in equity nor substantial compensation compelled for the failure to perform it; and the solution of this question depends upon, whether or not the Fidelity Company as trustee in the three subsisting mortgages executed to it by the railroad company is a purchaser for value without notice of the claim or rights of the improvement company. We shall therefore proceed to consider that question.

It is a well-settled principle of law, and especially in this State and in Virginia, that notice to a trustee is notice to his *cestui que trust*. *Beverely* v. *Brooke*, 2 Leigh, 446; *French* v. *Loyal Co.*, 5 Leigh, 641; *Le Neve* v. *Le Neve*, 2 Lead. Cas. Eq. 132, 145. In these states a trustee is always treated as a purchaser for value. *Wickham* v. *Lewis*, 13 Gratt. 430; *Manufacturing Co.* v. *Coal Co.*, 8 W. Va. 409. "Notice to trustees under an ordinary mortgage-deed of a railroad company is notice to the holders of the bonds secured by the mortgage. Such trustees are considered in the light of agents for the negotiating of the loan. They act for those who lend their money on the security of the mortgage. They are charged with the duty of protecting the interests of the bondholders, who are unconnected individuals, having no ready means of acting together except through trustees, whom the law appoints to act for them. Notice to the trustees is held to affect the title in their hands with reference to incumbrances upon the trust-property. Actual notice to the trustees of a prior equitable mortgage is notice of it to the bondholders, who therefore take their bonds subject to the legal consequences of the incumbrance." Jones, Ry. Sec. § 363; *Pierce* v. *Emery*, 32 N. H. 484, 521; *Miller* v. *Railroad Co.*, 36 Vt. 452.

Whatever is sufficient to put a person on inquiry is considered as conveying notice; for the law imputes a personal knowledge of a fact, of which the exercise of common prudence might have apprised him. When a subsequent

purchaser has actual notice, that the property in question is incumbered or affected, he is charged constructively with notice of all the facts and instruments, to the knowledge of which he would have been led by an inquiry into the incumbrance or other circumstance affecting the property of which he had notice.    2 Minor, Inst. 889 ; 2 Bart. Ch. Pr. 1006 ; Booth v. Barnum, 9 Conn. 286.

The first mortgage executed to the Fidelity Company is dated April 1, 1880, and was recorded on April 7, 1880. At the latter date the records of Jefferson county showed the following facts in respect to the Shenandoah Valley Railroad property :    (1) The mortgage to J. Edgar Thompson, trustee, dated October 15, 1872 ; (2) the mortgage to the Farmers' Loan & Trust Company, trustee, dated January 1, 1879 ; (3) the deed releasing the aforesaid mortgage to J. Edgar Thompson executed by W. H. Travers, substituted trustee, and dated August 25, 1879; and (4) the mortgage to W. H. Travers, trustee, dated July 1, 1871, but not delivered until September, 1879.   At the time the mortgage of January 1, 1879, to the Farmers' Loan & Trust Company was executed and recorded, the mortgage of October 15, 1872, had not been released, and as a legal consequence the Farmers' Loan & Trust Company held subject to the lien of said mortgage ; for it is a well-recognized and sound principle of law, that an entry of satisfaction by the mortgagee, after he has parted with his interest in the security, will not discharge the mortgage in favor of one who had acquired an interest in the land before the discharge was made.   Such person is no worse off, than he supposed himself to be, when he acquired his interest ; and there is no reason in equity, why the person really entitled to the mortgage should not have the benefit of it, so far as he is concerned.    2 Jones, Mort. § 957, and cases cited.

But this is not all. The said mortgage of January 1, 1879, contains the following provision :   " Resolved, that it is the judgment of the president and directors of the Shenandoah Valley Railroad Company, that the bonds authorized and directed to be issued on the 12th day of October, 1872,   *   *   *   be reduced to the sum of $2,250,000.00,   *   *   *   and that said bonds be secured by a first mortgage,   *   *   *   to

be executed and delivered to the Farmers' Loan & Trust Company." Thus we have an express declaration upon the face of this mortgage, that the bonds to be issued under it are to take up and secure the bonds, which had been issued under the said mortgage of October 15, 1872. The recordation of this mortgage was notice of this fact not only to the Farmers' Loan & Trust Company, the trustee therein, but to W. H. Travers, trustee in the deed of September, 1879, and the Fidelity Company, as trustee in the subsequent mortgages on the same property. *Tysen* v. *Railroad Co.,* 13 Amr. & Eng. R. Cas. 134, and cases cited in note, p. 138.

In the mortgage to W. H. Travers, trustee, dated July 1, 1871, but not delivered until September, 1879, is the following recital: "And be it further resolved, that the following indorsement, to be signed by the president and secretary, be made upon the bonds: 'This bond, and the mortgage to secure the payment of the same, although dated the first day of July, 1871, were not actually delivered until after the making and issuing of a series of bonds of the Senandoah Valley Railroad Company, amounting to $2,250,000.00, dated Jan. 1, 1879, and secured by a first mortgage upon the property and franchises of the Shenandoah Valley Railroad Company, of even date therewith, and duly recorded, which bonds and mortgage of Jan. 1st, 1879, were issued in substitution of the bonds and mortgage dated Oct. 15, 1872; and the mortgage to secure the payment of this bond is subject to the said first mortgage on Jan. 1, 1879.'" This recital of record as a part of this mortgage was notice not only to W. H. Travers, the trustee therein, but to the Fidelity Company and all other subsequent mortgagees or purchasers, that both this mortgage and the aforesaid mortgage of January 1, 1879, were made subject to and in part for the purpose of taking up the bonds issued under the prior mortgages of October 15, 1872, by the substitution of the bonds to be issued under it for the bonds secured by said mortgage of October 15, 1872.

The mortgage of April 1, 1880, executed to the appellee, the Fidelity Company, as trustee, contains the following recital: "And it is further resolved, that the board of directors be, and they are hereby, fully authorized and empow-

ered to negotiate with, and make such contracts or agreements with, the bondholders secured under the said mortgage of January 1, 1879, and the trustees thereof, with the bondholders secured under the second mortgage of July 1, 1871, and the trustee thereof, and with the holders of the different bonds, and with other creditors of and claimants against the company, or with either or any of them, upon such terms and conditions as the board of directors may deem proper, for the purpose of retiring and cancelling the bonds issued under the said mortgages, and obtaining a satisfaction and release of said mortgages, and retiring and cancelling the different bonds and other indebtedness of the company, or for any of these purposes, and to make, execute, and deliver such instrument or instruments in writing, as may be deemed expedient to effect these or any of these purposes. And it is further resolved, that for the purpose of retiring and cancelling the bonds issued under the security of the second mortgage, dated July 1, 1871, and obtaining a satisfaction and release of the same for the purpose of retiring any other bonds now issued and outstanding, and to settle other indebtedness of the company, or for any of these purposes, if in the opinion of the board of directors it should be deemed advisable so to do, and for the purpose of enabling the company to increase the facilities for a speedy completion of the road, and effecting the purpose of its incorporation, the board of directors are fully authorized and empowered, and have and hereby are given the consent of the stockholders of this company to create, issue and negotiate the certificates of loans or bonds of this company, coupon or otherwise. * * * And provided, further, that the first bonds issued under this resolution shall be used by the trustees for the purpose of exchanging the same with and canceling the bonds issued, and which may hereafter be issued, under the said first-mortgage of Jan. 1, 1879, to the Farmers' Loan & Trust Company of New York."

These recitals declare distinctly, not only that the bonds to be issued under this mortgage are, so far as may be necessary for the purpose, to be substituted for and used to cancel and retire the bonds theretofore issued under the said mortgages of January 1, 1879, and July 1, 1871, (September, 1879,) but

"for the purpose of retiring any other bonds now issued and outstanding, and to settle other indebtedness of the company;" and "that the *first bonds issued* under this resolution (mortgage) shall be used *by the trustees* for the purpose of *exchanging* the same with and *cancelling* the bonds issued and *which may hereafter be issued* under the said mortgage of Jan. 1, 1879." This deed was recorded on April 7, 1880, while the deed releasing the aforesaid mortgage of January 1, 1879, was not recorded until November 24, 1880, more than seven months thereafter. This fact makes the above italicised words, "which may hereafter be issued," significant, because the mortgage of January 1, 1879, to which those words refer, expressly provided, that the bonds to be issued under it were to be used to reduce and secure the bonds issued under the mortgage of October 15, 1872. It is hardly possible, that, at the time when the mortgage of April 1, 1880, was executed, it was contemplated, that any bonds would be thereafter issued under the mortgage of January 1, 1879, for the loan of money or to be sold on the market; but it is very probable, as the holders of the bonds under the mortgage of October 15, 1872, were entitled to have their bonds exchanged for bonds to be issued under the said mortgage of January 1, 1879, that it was contemplated by the parties to the mortgage of April 1, 1880, that bonds might be thereafter issued under the mortgage of January 1, 1879, in exchange for bonds issued under the mortgage of October 15, 1872, and it was these bonds, so thereafter issued in exchange, that the trustees in the deed of April 1, 1880, were to take up. This fact and purpose appearing upon the face of the mortgage to the Fidelity Company was of course notice to it.

It therefore seems clear, that the Fidelity Company is chargeable with notice, by the records, under which it claims title, that the holders of bonds issued under the said mortgage of October 15, 1872, have a prior lien on the railroad property in said mortgage mentioned, unless said lien had been either legally released or equitably barred, as against the rights of the Fidelity Company. I think it may be assumed as a legal proposition, which will not be controverted or denied, that, unless the deed of August 25, 1879, executed

by W. H. Travers as substituted trustee releasing the mortgage of October 15, 1872, operated to exempt the Fidelity Company from notice or any liability for the bonds issued under said mortgage, then the said company is not entitled to the position of a purchaser without notice as against the claim of the Central Improvement Company.

The said mortgage of October 15, 1872, provided, that in the event of the death of the trustee therein named the grantor should have the authority to appoint his successor. It seems to me therefore, that the substitution of W. H. Travers as trustee therein for J. Edgar Thompson, deceased, was a legal exercise of that authority and conferred upon said Travers all the powers possessed by said Thompson as trustee therein. The only provision in the said mortgage of October 15, 1872, which can be construed into authority to the trustee to release the same under any conditions or circumstances, is that contained in the proviso declaring : "that if the party of the first part  *  *  *  shall and do well and truly pay or cause to be paid unto the person or persons, bodies politic or corporate, who shall become the holders of the bonds intended to be secured hereby, the several respective sums expressed therein,  *  *  *  according to the provisions of said bonds,  *  *  ·*  then, and from thenceforth, as well this present indenture  *  *  *  as the said recited obligations shall become void and of no effect,  *  *  *  and satisfaction shall be forthwith duly entered by the said trustee or trustees for the time being upon the record of this indenture of mortgage."

This proviso is a positive contract between the grantor, the trustee and the bondholders, and contains the only authority, upon which the trustee can release the morntgage. The manner of exercising this authority is limited by the contract to the simple entry of satisfaction by the trustee upon the record of the mortgage. But even if this power could be properly exercised by the execution of a deed of release, as was done in this instance, it could only be done upon the condition precedent prescribed in the contract or mortgage itself, that is, upon the payment of the bonds to the holders thereof.; and any release or attempt to release the mortgage by the trustee, whatever may be its form, if exe-

cuted before the happening of or compliance with this condi-
tion, is absolutely null and void ; and a subsequent purchaser
must at his peril ascertain, whether or not this condition has
been performed.   2 Minor, Inst. 209, 237 ; 2 Perry Trusts,
§ 783 ; *Jackson* v. *Ligon*, 3 Leigh, 161; *Raper* v. *Sanders*, 21
Gratt. 60.   The trustee can only do with the trust-property
what the deed either in express terms or by necessary impli-
cation authorizes him to do.   *Seborn* v. *Beckwith*, 30 W.
Va. 774, (5 S. E. Rep. 450;) *Mundy* v. *Vawter*, 3 Gratt. 518 ;
*Heth* v. *Railroad Co.*, 4 Gratt. 482.

" When a recorded mortgage is discharged by a person
other than the mortgagee, the person paying the money, and
all subsequent purchasers as well, are bound to inquire what
authority he had to discharge it, and are chargeable with
notice of such facts as by proper inquiry might have been as-
certained.   *   *   *   A mortgagee, with notice that a prior
mortgage has been improperly discharged without being sat-
isfied, still holds subject to that mortgage as much as if no
discharge had been made.   If, for instance, he has notice
that the prior mortgage has been assigned as collateral
security, and, the assignment not being recorded, the assignor
enters satisfaction of it on record, this does not deprive the
assignee of his priority of claim.   The discharge, however,
would bar all equitable rights of the assignor, and the as-
signee could recover only to the extent of his actual interest
in the mortgage."   2 Jones, Mortg. § 957 ; *Swarthout* v.
*Curtis*, 5 N. Y. 301.

The said deed of release of August 25, 1879, after recit-
ing the provisions of the mortgage of October 15, 1872, and
the fact, that the Shenandoah Valley Railroad Company had
executed the mortgage of January 1, 1879, to the Farmers'
Loan & Trust Company to secure $2,250,000.00 of bonds, con-
tains the following provision :   "And whereas, there have
been surrendered to the said party hereto of the first part,
the trustee substituted as aforesaid, all of the bonds, as well
those issued as those executed but not issued under and in
pursuance of the terms of the said mortgage, bearing date
Oct. 15, 1872, for cancellation ; and whereas, the said trus-
tee hath cancelled and destroyed all of the said bonds, num-
bering 3,750, each for $1,000.00, amounting in all to the

sum of $3,750,000.00, being the whole number and amount of bonds secured by the said mortgage deed dated Oct. 15, 1872, and hath cancelled also and destroyed all coupons attached to and detached from the said bonds, and that in any wise and at any time belonging to the said bonds : Now, in consideration of the premises, and of the payment of the sum of $5.00 by the party of the second part to the party of the first part, the said William H. Travers, by virtue of the authority vested in him as substituted trustee, as aforesaid, by the said mortgage-deed, bearing date the 15th day of Oct., 1872, and in discharge of the trust therein reposed in the trustee named therein, and his successor or successors, doth grant, remise, release, surrender, assign and set over unto the Shenandoah Valley Railroad Company all the right, title, interest, property and estate granted and conveyed by the mortgage-deed bearing date as last mentioned, and recorded as aforesaid, and to which reference is hereby expressly made for a description of the same, to the intent that all the right, title, interest, property, and estate of the said Shenandoah Valley Railroad Company, granted as aforesaid, may be discharged from the said mortgage."

It will be observed that the words "surrendered," "cancelled," and "destroyed" are used in this provision of the deed ; but it is nowhere stated therein, that the bonds secured in the mortgage of October 15, 1872, had been either paid or satisfied. It will also be noted, that it is not stated, by whom the bonds "had been surrendered,"—whether by the owners or holders or some unauthorized person. It becomes therefore important to inquire into the facts and circumstances, under which said bonds were "surrendered," because the cancellation of a mortgage on the record is only *prima facie* evidence of its discharge, and the owner may prove, that the cancellation was done by fraud, accident or mistake, and, if he does this, his rights under the mortgage will not be affected by the improper cancellation of it. *Heyder v. Association*, 42 N. J. Eq. 403, (8 Atl. Rep. 310); *Kenicott v. Supervisors*, 16 Wall. 469 ; *Harris v. Cook*, 28 N. J. 345. "A release executed by a trustee in a deed of trust without the authority of the *cestui que trust* and without having received payment of the debt secured does not discharge

the lien." 2 Jones, Mortg. § 957; *Lakenan* v. *Robards,* 9 Mo. App. 179.

The circumstances, under which the $531,000.00 of bonds of the Central Improvement Company were "surrendered" and destroyed, appear by the record to be as follows : The office of the improvement company in the city of Philadelphia was kept in the office of the Pennsylvania Railroad Company. The said $531,000.00 of bonds had been put in the safe of the improvement company in its office by J. P. Green, the then treasurer of the company. Green resigned and turned the bonds over to his successor, J. H. MacKechan, who died, and was in the year 1877 succeeded as treasurer by his brother, C. W. MacKeehan, who held said office until after 1880. The bonds remained in said safe, and it seems that C. W. MacKeehan was never informed that they were there. After the aforesaid agreement of April 29, 1878, had been executed, and a duplicate copy thereof delivered to the railroad company, and only a few days after W. H. Travers had been made substituted trustee in the said mortgage of October 15, 1872, (the appointment of said Travers having been made on December 6, 1878,) the said Travers, accompanied by U. L. Boyce, the vice-president of the railroad company, went to the office in which said bonds were kept, where they found J. P. Green, a vice-president of the Pennsylvania Railroad Company, but who had no authority or control over the said bonds, took possession of the said $531,000.00 of bonds, and destroyed them with all the other bonds issued under the said mortgage of October 15, 1872.

J. P. Green, in answer to the question, "Under what circumstances were these bonds destroyed?" deposes: "My understanding was, at the time, it was in pursuance of an arrangement between the Central Improvement Company and the Shenandoah Valley Railroad Company, by which all of the old first-mortgage bonds were to be destroyed, and new bonds take their place." And the said Travers, in reply to the same question, deposes: "I had known, that negotiations were going on between the Shenandoah Valley Railroad Company and the Central Improvement Company, to whom a portion of these bonds had been delivered, to relieve the road from the incumbrance of the mortgage of 15th of October,

1872, and I was advised of the fact, that those bonds had been surrendered to or were under the control of the Central Improvement Company and were ready for cancellation and destruction. Under that arrangement and being so advised I went to the office of the Central Improvement Company and the Pennsylvania Railroad Company and found the bonds there in the possession of Mr. Green. I examined them and found, that they were all there as described and called for in the deed of trust of October 15, 1872, together with all the coupons attached,—and some of them probably had been detached,—and they were destroyed in my presence and with my assistance." Mr. Travers also testified that he was at the time a stockholder, director and general counsel for the railroad company.

It is impossible to assert or believe in the presence of these facts and others appearing in the record, that Mr. Travers did not take possession of and destroy said bonds of the improvement company under and upon the authority contained in the aforesaid agreement of April 29, 1878, and upon that authority alone. Any other conclusion would place Mr. Travers in the position of having destroyed them without any right whatever to do so; for there is not a particle of evidence, that he had any other authority. Having destroyed said bonds under the authority conferred by said agreement Mr. Travers of course knew its contents. By the terms of said agreement,—which the Fidelity Company admits and insists is a valid and binding contract,—the improvement company agreed to surrender and deliver to the railroad company the said $531,000.00 of bonds in consideration of the issuing and delivery to it by the railroad company of certain second-mortgage and income-bonds therein specified. The surrender of the bonds held by the improvement company and the delivery of the bonds to be given in exchange therefor by the railroad company were to be dependent or concurrent acts. If they were not both performed at the same time, the performance of its part by either company imposed an immediate obligation on the other to perform its part. It therefore appears, that the railroad company by U. L. Boyce, its vice-president, and W. H. Travers, the substituted trustee in the mortgage of Octo-

ber 15, 1872, assumed the responsibility of performing and
did perform for the improvement company its part of said
agreement without its knowledge or assistance. Whatever
might be said by the improvement company as to the pro-
propriety and good faith of this transaction, it is certain that
neither the railroad company nor W. H. Travers, the trus-
tee, can question or deny that it was, in effect, a full and
complete performance on the part of the improvement com-
pany of its part of said agreement, and that it thereby be-
came, *eo instanti*, entitled to the substituted bonds provided
for therein. Of this fact both the railroad company and W.
H. Travers were of necessity fully informed. It is thus ap-
parent that the word " surrendered" was advisedly used in
reference to these bonds by Mr. Travers in the deed of re-
lease of August 25, 1879.

We have now shown, that the " surrender " of said bonds
was upon the authority of an agreement, and under circum-
stances, which made it the duty of the trustee to see, that
the bonds due to the improvement company by virtue of said
agreement were delivered to it, or at least to give notice to
subsequent purchasers of the fact, that said company was en-
titled to said bonds. It must therefore be presumed, that,
if he did not perform this duty by giving such notice to the
Fidelity Company and the other subsequent purchasers, he
certainly would have informed them of all the facts, if in-
quiry had been made of him. *Caylus* v. *Railroad Co.*, 10
Hun 295; *Acer* v. *Westcott*, 1 Lans. 193; 1 Story, Eq. Jur.
§ 399.

Was there anything upon the records or in the circum-
stances of the transaction, which made it the duty of the
Fidelity Company as a subsequent purchaser to make this
inquiry ? As we have seen, the only condition, upon which
the trustee was authorized to release the mortgage of Octo-
ber 15, 1872, was upon the true payment of all the bonds
therein secured to the holders thereof. Now in the search,
which the Fidelity Company was legally bound to make,
when it read the mortgage and there found in the deed pur-
porting to release that mortgage the word " surrender," in-
stead of " payment" or " satisfaction," would it not have
been an act required by the most ordinary prudence and dil-

igence for it to have gone to Mr. Travers, the trustee, who had used that word in executing the release, and have made of him the inquiries, by whom and under what circumstances were said bonds "surrendered?" In addition, the Fidelity Company knew from the records, through which it claims title, that the prior mortgages of January 1, 1879, and of September, 1879, had been executed to take up the bonds issued and outstanding under the mortgage of October 15, 1872, and that its mortgage of April 1, 1880, was in turn executed to take up the bonds then or thereafter issued under said mortgage of January 1, 1879. Wade, Notice, §§ 308, 309; *Taylor* v. *King*, 6 Munf. 358; *Briscoe* v. *Ashby*, 24 Gratt. 454; *Coles* v. *Withers*, 33 Gratt. 201. And, of necessity, it must also have known, that the Shenandoah Valley Railroad was at the time, if not insolvent, not plethoric with money to pay off its bonds before maturity, and that it was not likely, that the holders would gratuitously surrender their first mortgage bonds to the company or its trustee and especially so, in the face of the fact, that the company was then using its utmost efforts to borrow money, and shingling over its property with new mortgages for that purpose.

It seems to me, that, if these facts and circumstances were not sufficient to excite diligence and invoke inquiry from the most careless, then nothing in reason could be expected to do so. "A party willfully closing his eyes against the lights, to which his attention has been directed, and which, if followed, would lead to a knowledge of all the facts, is chargeable with notice of every fact, that he could have obtained by the exercise of reasonable diligence. * * * The limit of inquiry necessary in any case is that required by the use of reasonable diligence. What is reasonable diligence can not be determined by any general rule, but must vary with the circumstances of each case." 1 Jones, Mortg. § 596. The circumstances in this cause it seems to me, are entirely sufficient to have put the Fidelity Company on inquiry as to the terms and conditions and by whom the bonds of the improvement company were surrendered; and if the company had made this inquiry of the trustee, W. H. Travers, it would have been informed, that they had been taken possession of by him, and destroyed, under the said agreement of April

29, 1878, and this agreement would have given it notice of the equitable lien of said company. *Burwell* v. *Fauber*, 21 Gratt. 463; *Long* v. *Weller*, 29 Gratt. 353; *Watts* v. *Kinney*, 3 Leigh, 293, 296; *Association* v. *Thompson*, 31 N. J. Eq. 536; *Swarthout* v. *Curtis*, 5 N. Y. 301, 309; *Claflin* v. *Railroad Co.*, 8 Fed. Rep. 118; *Brush* v. *Ware*, 15 Pet. 93; *Roberts* v. *Halstead*, 9 Pa. St. 32.

I am therefore of opinion that the Fidelity Company is not a purchaser without notice as to the said equitable lien of the improvement company.

Having reached this conclusion, it is apparent there is no foundation for the contention of the improvement company, that the railroad company has disabled itself by subsequent mortgages from performing its part of the said agreement of April 29, 1878. All these mortgages are subordinate to the claim of the improvement company under said agreement; and said claim may be enforced not only against the railroad company but also against those claiming under said mortgages. I think it better to abstain at this time from indicating the manner, in which this equitable lien of the improvement company ought to be enforced, or the specific form of the relief to be granted in that behalf under the peculiar circumstances of this cause, for the reason that none of these matters were considered or passed upon by the Circuit Court; nor were they discussed by counsel in the argument before this court. From what has already been said, and from the facts appearing in the record, it is not apprehended there can be any serious difficulty in settling these questions.

It seems to me, the objections made by the Fidelity Company to the right of the improvement company to intervene in this cause are not well taken. While it is true, the decision in *Muller* v. *Dows*, 94 U. S. 444, and other cases hold, that the railroad property in this State could have been sold in the Roanoke city suit, still, as the railroad company is a domestic corporation of this State as well as Virginia, and the plaintiff, the Fidelity Company, has elected to invoke the jurisdiction of a court in this State in aid of its suit in Roanoke city, I do not think it can exclude the creditors of the railroad company from intervening in either court.

In the view we have taken of the rights of the improve-

ment company in this cause, the question of laches does not apply. It appears from the amended bill in the Crumlish suit, that the plaintiff never discovered until after December, 1882, that there was any adverse claim or denial of the right of the improvement company to the bonds, which it was entitled to under the agreement of April 29, 1878. It also appears in the record, that all the bonds issuable under the mortgage of April 1, 1880, had been negotiated in 1881, before said discovery was made; and consequently, even if the holders under that mortgage were not purchasers with notice, any delay after they had invested their money in 1881, could not be to their prejudice. It therefore seems to me, for this reason and others so apparent in the record as to require no discussion, that the defence of laches must be overruled.

For the reasons stated I am of opinion that both the decrees appealed from in these causes must be reversed,—that of November 29, 1887, at the costs of J. Garland Hurst, administrator etc., the plaintiff therein; and that of September 11, 1888, at the costs of the Fidelity Insurance, Trust & Safe-Deposit Company, the plaintiff therein,—and that these causes be remanded to the Circuit Court for further proceedings there to be had therein according to equity and the principles announced in this opinion.

REVERSED. REMANDED.