644 HART v. SANDY.

## CHARLESTON.

HART et al. v. SANDY et al.

Submitted June 20, 1894.—Decided December 15, 1894.

1. SALE—FRAUD—DEBTOR AND CREDITOR.

S. purchases a sawmill and fixtures in October, 1889, from H. and pays him three hundred dollars cash and executes two notes for two hundred and ninety dollars each payable in nine and eighteen months with interest for the residue and agrees to give a deed of trust on said property to secure said deferred payments. He does not execute the trust at the time for the pretended reason, that he is in a hurry to remove the property to another county, where he resides, but promises H. that, if he will prepare and send the trust-deed to him, he will execute it and have it placed on record. In the month of February, following said deed of trust was prepared and presented to said S. on two occasions, when he declined to execute it. In the month of April following he sold said property to the widow of his deceased brother, who through her husband and agent had notice of the debt due H. the agreement to execute said trust and the refusal on the part of S. to comply therewith. At the time of the sale a written conveyance of this personal property was executed acknowledged and recorded, and more than twenty days thereafter four hundred and eighty dollars of the purchase-money was counted out by defendant N., the second husband, as the agent of his wife to S. in the presence of a witness who was called in. About the time of the purchase of said mill and fixtures by S. he sold his lands for two thousand and one hundred dollars. Shortly after the sale of the mill-property he sold his horse to said husband, which was all the property owned by him in this state; and said S. then left the state without securing the notes of H. and has remained away ever since. Held, that these circumstances show, that the sale of said mill-property was made with intent to hinder, delay and defraud H., and that N. the wife of said agent, had notice of the fraudulent intent, and that said sale was void as to H.

2. SALE—FRAUD—DEBTOR AND CREDITOR.

A creditor can not purchase the goods of his debtor at a price in excess of his debt, when he knows that the excess so paid such debtor is by the latter to be placed beyond the reach of his other creditors. Such purchaser is a participant in the fraud of his debtor, whether his purpose be to aid him or not.

3. SALE—FRAUD—DEBTOR AND CREDITOR.

Wherever there appears to be connected with the transaction

circumstances indicating excessive effort to give it the appearance of fairness or regularity, which are not usual attendants of such business, the courts will regard such circumstances as badges of fraud.

WELLS & PENDLETON for appellants:

I.—*The argument created an equitable lien on the property.*—3 Pom. Eq. Jur. § 1235; 2 Sto. Eq. Jur. §§ 1219, 1220, 1228, 1231, 1502; 1 Jones Liens § 77; 2 Am. Dec. 696; 4 Am. Dec. 604; 19 Am. Dec. 398; 8 Gratt. 224; 21 W. Va. 516; 30 W. Va. 790.

II.—*Notice.*—Sto. Eq. § 140; Whar. Ag. §§ 177, 178; 1 Par. Con. (6th Ed.) s. p. 74, 76; 1 Am. & Eng. Ency. L. 419 and n., 429; 6 Am. Dec. 268; 9 Am. Dec. 738; 49 Am. Dec. 57; 13 N. H. 145; 115 Ill. 289; 80 Mo. 179; 1 Am. St. Rep. 659; 9 Am. St. Rep. 698; 5 Leigh 658; 32 W. Va. 259.

III.—*Constructive notice.*—3 Conn. 146; 7 Conn. 333; 9 Conn. 286; 13 Ves. 121; 9 Paige 470; 5 Leigh 627, 655–657; 23 W. Va. 595; 30 W. Va. 784; 32 W. Va. 259.

W. A. PARSONS for appellees cited 16 Am. Rep. 100; Bump. Fraud. Convey. 228; 35 W. Va. 547; 46 N. Y. 384; 11 Ill. 665; 45 Am. Rep. note 184; Id. 178; 79 N. Y. 102; 27 Hun. 359; 1 Par. Cont. 74, 75, note; 1 Am. & Eng. Ency. L. 419 note, 420, 421; 39 Am. Rep. 319; 37 Am. Rep. 750; 1 Am. Rep. 164; 13 Am. St. Rep. 208; 32 W. Va. 259; 30 W. Va. 791; 21 W. Va. 516; 13 Am. & Eng. Ency. L. 608; 3 Pom. Eq. Jur. § 1233.

J. W. C. ARMSTRONG and G. F. CUNNINGHAM for appellees cited 1 Am. & Eng. Ency. L. 419, 420, 421; 115 Ill. 289; 8 Kan. 519; 113 Mass. 391; 129 Mass. 290; 102 U. S. 263; 1 Per. Tr. (3d Ed.) § 222; 39 Am. Rep. 319; 23 W. Va. 101; 17 Gratt. 96; 34 W. Va. 230; 32 W. Va. 482; 3 Gratt. 328.

ENGLISH, JUDGE:

This was a suit in equity brought by C. M. and J. B. Hart in the Circuit Court of Roane county against G. W. Sandy, Samuel Noe, Letitia Noe, William E. Swiger, trus-

tee, B. F. Lowe, John Nay and G. T. Harrison. The plaintiffs say in their bill that on the 15th of October, 1889, they sold to the defendant, G. W. Sandy, a boiler for use in a steam-mill, a sawmill rig and fixtures, a bill of pulleys, small shafting, boxing, piping, belts, and an inspirator and fixtures for use in connection with said sawmill at the price of eight hundred and eighty dollars, of which sum said Sandy paid three hundred dollars and executed to plaintiffs his two promissory notes for two hundred and ninety dollars, each bearing date the 15th day of October, 1889, and falling due respectively at nine and eighteen months with interest from date at six *per cent. per annum* for the residue of said purchase-money;—that at the time of said sale to said Sandy and the execution of said notes by him it was expressly understood and agreed by and between the plaintiffs and said Sandy, that he should execute a deed of trust upon said property so purchased to secure said two promissory notes, and that said notes recite on their face, that they are secured by deed of trust, but the said deed of trust was not then prepared, for the reason that said Sandy was in a hurry to get his said mill and fixtures removed to the place, where he expected to set the same up, and the plaintiffs then agreed to have said deed of trust drawn up and sent to said Sandy for his signature and acknowledgment at an early day;—that plaintiffs did afterwards have said trust deed prepared, and about the 1st of February sent the same to said Sandy for his signature and acknowledgment, but he failed and refused to sign or acknowledge said trust-deed and has not as yet signed the same;—that at the time of the purchase of said property from plaintiffs said defendant was the owner of a steam-engine and fixtures for a gristmill, which he had purchased from the defendants B. F. Lowe, John Nay and G. T. Harrison, and which was then located in the county of Harrison;—that after said purchase from plaintiffs he moved the property purchased from plaintiffs and the property purchased from Lowe, Nay and Harrison to the county of Roane in this state;—that, after said Sandy had run said sawmill for several months, he, by and with the advice of the defendant Samuel Noe made a voluntary and fraudulent transfer of said sawmill

and fixtures and said gristmill and fixtures and also of a horse, saddle and bridle, which he then owned, to the defendant Letitia Noe, who was then and still is the wife of said Samuel Noe;—that the said Samuel Noe pretended to be acting as the agent of his wife in the purchase of said property from the defendant Sandy ;—that said transfer was made by written instrument in the form of a deed which was brought to the town of Spencer by said Noe and filed in the clerk's office for record, and is now of record in said clerk's office, a certified copy of which is filed as Exhibit A; —that the said transfer of said property was made by said Sandy with intent to hinder, delay and defraud his creditors of and from what they are entitled to, and especially to hinder, delay and defraud the plaintiffs in the collection of their said debt against him, and to screen said property so that it could not be reached by legal process in any proceeding which plaintiffs might institute for the recovery of their said claim ;—that said Letitia Noe and Samuel Noe had full notice and knowledge of the fraudulent intent of said G. W. Sandy in making said transfer, and full notice, that Sandy was largely indebted to the plaintiffs and to other persons and had contracted to give plaintiffs said deed of trust to secure said debt to them ;—that said Samuel Noe was the confidential adviser of said Sandy in said transaction and participated with him in said scheme for the purpose of aiding him in carrying out his fraudulent designs against the plaintiffs and colluded with the said Sandy and procured him to make said conveyance to the said Letitia for the further purpose of profiting himself thereby ;—that said transfer to said Letitia was voluntary and not upon a consideration deemed valuable in law;— that, if any money or other thing of value passed from said Letitia to Sandy as a consideration for said transfer, it was again returned to her by said Sandy;—that, if any payment of money was made, the said Sandy furnished the same and caused it to be paid for the purpose of giving color and semblance of fairness to said transaction ;—that soon after said fraudulent transfer of said property said Samuel Noe, pretending to be acting as the agent of his said wife called in a witness and turned over to the

said Sandy four hundred and eighty dollars, claiming the same was the last payment on said mills, which he pretended to be paying for his wife, Lettia Noe, and took from the said Sandy a written receipt for said money, all of which plaintiffs charge was done for the purpose of giving color to said alleged sale and for no other purpose, and which money was either furnished by the said Sandy for said purpose or was returned by him to the said Samuel and Letitia Noe;—that said Sandy left the state soon after said transfer without having provided for the payment of the plaintiffs' demand, or securing the same in any way, and that the property so transferred was the only property owned by said Sandy at that time and was worth at least two thousand dollars;—that said Sandy had taken said Samuel Noe in as a partner in said milling business a short time before said transfer, and that said Letitia was prior to her marriage to said Samuel Noe the widow of a deceased brother of said Sandy;—that said Sandy was an unmarried man and boarded in the family of said Samuel Noe for some time previous to said transfer;—that the said sawmill, boiler and fixtures, *etc.*, are now located on the lands of Samuel Noe in Roane county and were so located prior to said transfer;—that about the 1st day of October, 1889, said G. W. Sandy executed to the defendant W. E. Swiger, trustee, a deed of trust upon said engine and gristmill and fixtures to secure to the defendants B. F. Lowe, John Nay and G. T. Harrison the sum of five hundred dollars therein mentioned, but plaintiffs are not informed, whether the same has been paid or not, which deed of trust was duly admitted to record, and the plaintiffs call on said Lowe, Nay and Harrison to answer and say how much, if anything, has been paid on said trust-debt, and what amount remains unpaid thereon;—and they pray that said fraudulent transfer of said property to said Letitia Noe may be set aside and declared fraudulent and void as to the plaintiffs' demand, that they may have a decree for their claim against said Sandy, and that said sawmill and fixtures *etc.*, may be sold to satisfy the plaintiffs' demand *etc.*

B. F. Lowe, John Nay, G. T. Harrison, and W. E. Swiger, trustee, answered said bill denying that anything had

ever been paid on their trust-deed. Samuel Noe also answered said bill stating that G. W. Sandy owed him six hundred dollars in April, 1890, and that Letitia Noe, his wife, had something over five hundred dollars in cash, which she had received as a sum in gross in lieu of dower in her former husband's estate ; and that to enable him to save said six hundred dollars she agreed to purchase the mill property, fixtures *etc.*, of said Sandy, if respondent would pay as much as five hundred dollars on said property and wait on her until a sale of said property could be made to enable her to repay him, which proposition was agreed upon, and she made the purchase; and he proceeds to put in issue every material allegation of the plaintiffs' bill. Letitia Noe also filed her answer putting in issue the allegations of the bill as to her connection with the transaction.

The plaintiffs also filed an amended bill, in which they alleged, that the agreement made and entered into between said G. W. Sandy and the plaintiffs at the time of the sale of said sawmill and fixtures, that the said Sandy would give a deed of trust on the said property as security to the plaintiffs for the said two promissory notes of two hundred and ninety dollars each, was a part of the consideration of said sale to said Sandy and created an equitable lien upon said property in favor of the plaintiffs, of which the said Samuel Noe and Letitia Noe had notice, at the time the defendant Letitia Noe purchased the said property from said Sandy through the said Samuel Noe as her agent ; and they pray, that in the event the court should be of opinion, that the transfer of the entire property from said Sandy to said Letitia is not fraudulent or voluntary, then the plaintiffs' equitable lien created by said agreement may be enforced against the said property, and the same be sold to satisfy the plaintiffs' debt and costs.

G. W. Sandy demurred to said amended bill, and Samuel Noe and Letitia Noe answered the same, and the cause was heard upon the bill, amended bill, answers to each and replications thereto and upon the demurrer to said amended bill, which demurrer upon consideration was overruled by the court and disallowed ; and the court held that the plaintiffs were not entitled to the relief prayed for and

82

dismissed their original and amended bills with costs but without prejudice as to any suit, which the plaintiffs might thereafter institute against said G. W. Sandy; and from this decree the plaintiffs appealed.

The first error assigned and relied upon by the appellants is, that the court erred in holding said transfer of said property to Letitia Noe valid as against appellants' debt, claiming that the proofs show clearly, that there was fraud in the transfer, and that defendants Samuel and Letitia Noe had notice of G. W. Sandy's fraudulent intent and participated therein.

In determining a question of this character this Court has frequently held, that the surrounding circumstances may be taken into consideration, and from the fact, that fraud seeks concealment, circumstantial evidence is frequently the only evidence that can be obtained. The question then presented for our determination is: Did G. W. Sandy convey the property in the bill mentioned to Letitia Noe with intent to hinder, delay and defraud the plaintiffs in the collection of their debt, and did said Letitia Noe have notice of said fraudulent intent? When we go to the date of the purchase of the mill and machinery by G. W. Sandy from the plaintiffs, we find that said Sandy shortly before purchasing said machinery had sold his land for two thousand one hundred dollars in cash and a horse valued at seventy five dollars, and that out of this he paid the plaintiffs the cash payment of three hundred dollars on said sawmill and fixtures on the 15th day of October, 1889, and executed to the plaintiffs his two notes for two hundred and ninety dollars each payable respectively in nine and eighteen months with interest from date for the residue, which notes were to be secured by deed of trust upon said sawmill and fixtures, when said machinery was delivered to him.

C. W. Gould states in his testimony that the reason said deed of trust was not executed at the time the sale was made was that it was the middle of the afternoon before the trade was consummated, and G. W. Sandy did not want to wait until the deed could be prepared, as he wished to get to Jane Lew in Lewis county that evening; but he

made arrangements with the plaintiffs to prepare same and send it to him in Roane county (Sandy's home) and then he would execute said deed and have it put on record in Roane county at the plaintiff's expense. Said witness also states that the plaintiffs prepared said deed of trust and sent it to said Sandy by him, and that he communicated the facts concerning the agreement between plaintiffs and said Sandy to execute said deed of trust to said Samuel Noe, the defendant, by reading to him a letter from C. M. Hart to witness setting forth said agreement prior to the 1st of April, 1890 ; that he was trying to induce Noe to influence said Sandy to execute the deed of trust, which he had at the time, as he, Sandy, was liable to have trouble unless he did so ; that at the time witness read the letter to said Noe from Hart, before referred to, which was prior to April 1, 1890, he (Samuel Noe) remarked to witness that he had no interest in the controversy of Sandy with Hart, and that Sandy would have to settle that, but he (Noe) had already bought a one third interest in said mill and machinery, and had paid Sandy for same in cattle and lands, which conversation took place at the Taylor schoolhouse. The witness further says that he presented said deed of trust to said Sandy twice in the month of February, 1890, and he refused to execute it each time, but did not deny his agreement with plaintiffs to execute the same.

Now, it appears that Letitia Noe, to whom this property was conveyed on the 26th day of April, 1890, before she became the wife of Samuel Noe, was the widow of G. W. Sandy's brother. She was sick in bed at the time this property was conveyed to her. It also appears that on the 22d day of February, 1890, she had received from W. S. Haymond the sum of five hundred and forty four dollars and fifty cents as a gross sum in lieu of her dower in certain lands of which her first husband died seised and possessed, and that in order to save about six hundred dollars, which G. W. Sandy owed her husband, Samuel Noe, she agreed to purchase said mill-property and fixtures from said Sandy, her said husband acting as her agent in the transaction. This statement, however, does not comport well with the statement made by said Samuel Noe to the witness Gould,

that he had already bought one third of said mill and machinery from said Sandy and paid him in land and cattle. The question naturally suggests itself: If said G. W. Sandy owed said Samuel Noe six hundred dollars, why did he pay him in lands and cattle for said one third interest, and why the necessity of said Letitia Noe advancing her five hundred dollars to aid in purchasing said property to save a debt of six hundred dollars due her husband, when said husband had been paying said Sandy in lands and cattle for a portion of the property? And again, the witness Gould says that said Samuel Noe asked him "if he did not think that Sandy (or we) had set that job up nicely on Hart." Samuel Noe states in his deposition that he acted as the agent of his wife, Letitia Noe, in the purchase of the mill property, and that he had heard from one Gould that said Sandy was to give a deed of trust to plaintiffs to secure their debt, but that Sandy denied it.

The evidence, then, clearly shows that Samuel Noe had notice of the existence of the debt from said Sandy to plaintiffs, and the fact that he had agreed to secure the same by trust-deed. When we consider the intimate relations between husband and wife and the relationship existing between said Sandy and Letitia Noe and the further fact, that said G. W. Sandy had been doing business in partnership with Samuel Noe, and that said Letitia was called upon to pay out her own money, which she had received from her deceased husband's estate, there can be no doubt, that this transaction had been thoroughly discussed between said G. W. Sandy and Samuel Noe and his wife. Said Samuel Noe in his deposition states that said Sandy told him that he owed plaintiffs about five hundred dollars, and, when asked the question : " Did you not agree with G. W. Sandy to pay plaintiff's claim against him ?"—replied, " I did not; Sandy told me that he would leave a payment for Hart at Charleston."

Again, it appears in evidence that when G. W. Sandy conveyed to said Letitia Noe said mill property he parted with all the visible property he owned, except a horse, saddle and bridle, which the defendant Samuel Noe says he afterwards purchased from him, paying him therefor one hundred dollars.

Another circumstance, which should be given some importance in this case, is that the witness, Geary, states that on the 20th day of May, 1890, twenty four days after the date of said conveyance to said Letitia Noe and twenty one days after said conveyance was acknowledged and admitted to record, Samuel Noe paid G. W. Sandy four hundred and eighty dollars for the defendant Letitia Noe, which witness counted, and Mr. Noe took a written receipt for the money, which he witnessed at their request. Why was this particularity and formality observed, if there was not some apprehension? and that there was not only notice, but also apprehension of some difficulty in making the purchase is apparent from the testimony of Edmund Hugill, who states that he asked Mr. and Mrs. Noe, if there was any arrangement to pay the notes given by Sandy to Hart for the mill. Their answer was that there was no arrangement made, and that they would not pay the notes. He then informed them that he would sell the mill, if they did not pay said notes. Mr. Noe said he would be with us or something to that effect. Witness then asked Noe, if he did not know, that the trade with Sandy was not to be closed until the deed of trust was executed as agreed by Sandy. He answered in the presence of Letitia Noe, that he knew about the deed of trust, or that he had heard of the deed of trust, but that he had taken counsel of an attorney, and that he had told him (Noe) that there was nothing on record against said property, and that he would be safe in buying it. Now, while it is true this conversation occurred after said Sandy had sold said property to Letitia Noe, yet it shows an admission on the part of said Samuel Noe, that he knew about the deed of trust or had heard about the deed of trust and had taken counsel of an attorney in regard to the matter, who advised him that there was nothing on the record against said property, and he would be safe in buying it.

The circumstances shown by the evidence in this cause can lead to no other conclusion than that G. W. Sandy made this conveyance to his relative Letitia Noe with the intention of hindering, delaying and defrauding the plaintiffs. Shortly before purchasing this mill and machinery

from the plaintiffs he had sold his land for two thousand and one hundred dollars cash and a horse valued at seventy five dollars. At the time of the purchase of said machinery he was in so much of a hurry to leave Shinnston and reach Jane Lew, that he had not time to execute the deed of trust to secure the notes given by him for the deferred payments, and when the trust-deed was prepared and sent to him for execution in Roane county, and although the same was presented to him twice in the month of February 1890 with a request, that he should execute it, he positively refused. His scheme was to sell said mill and fixtures to his relatives in such a way, that it could not be reached by plaintiffs, pocket the proceeds and go to the Western states. At least that was what he attempted to do, and that was the reason that Samuel Noe consulted counsel, as shown by the deposition of the witness Hugill, to ascertain whether he would be safe in buying the property.

Did Letitia Noe have notice of the fraudulent intent of G. W. Sandy in selling and conveying said property to her (for a written conveyance was executed and acknowledged and recorded when the property would have passed by delivery, being personal property)? It appears from the testimony of Samuel Noe and from the answer of himself and wife, that he acted as the agent of his wife in making the purchase of this machinery.

Upon the question of notice, we find the law stated thus in 1 Am. & Eng. Ency. Law, p. 419: "In the relation of the principal to a third party, the undisputed rule exists that notice to the agent is notice to the principal, if the agent comes to the knowledge of facts while he is acting for the principal. But notice to the agent, to bind the principal, must be within the scope of the agent's employment."

In the case of *Jackson* v. *Sharp*, 9 Johns. 163, it was held that, "if a subsequent purchaser have notice at the time of his purchase of a prior unregistered deed, it is the same to him as if such deed had been registered; and if the agent of such subsequent purchaser, at the time of making the purchase, knows of the prior or unregistered deed, it is the same as notice to his principal."

1 Pars. Cont. (8th Ed.) p. 75, states the law upon this point as follows : "A principal is affected by notice to his agent respecting any matter distinctly within the scope of his agency, when the notice is given before the transaction begins, or before it is so far completed as to render the notice nugatory. The notice to an agent may be implied as well as expressed ; knowledge obtained by the agent in the course of that very transaction is notice." And in the note it is said : "The reason generally given for charging the principal with notice is that it is the duty of the agent to communicate to his principal the knowledge he has of the subject-matter of the agency ; and in the latter class of cases (that is, where it was recently acquired) it is said that he is bound to do so irrespective of when the information was acquired, and that he is presumed to discharge this duty."

Upon this point we find it stated in Story, Ag. § 140 : "Notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from or is at the time connected with the subject-matter of his agency ; for, upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal, and, if he does not, still, the principal having intrusted the agent with the particular business, the other party has the right to deem his acts and knowledge obligatory upon the principal ; otherwise the neglect of the agent might operate most injuriously to the rights and interests of such party."

Bump, on Fraudulent Conveyances, on page 494, says : "The notice of the fraud need only be sufficient to put a man of ordinary prudence and experience in business transactions upon the inquiry. * * * Whatever is sufficient to direct his attention to the prior rights and equities of creditors, and to enable him to ascertain their nature by inquiry, will operate as notice. When a purchaser has knowledge of any fact sufficient to put him upon inquiry, he is presumed either to have made the inquiry and ascertained the extent of the right that he may possibly prejudice or to have been guilty of a degree of negligence fatal to the claim to be considered a *bona fide* purchaser. This

notice may be derived from its statement of creditors or
other parties. * * * The purchaser is chargeable with
notice of all the matters which appear to be within the
knowledge and memory of his agent." Again, on page
204, the same author says: "It is not necessary that the
grantee shall be one of the originators of the fraudulent
scheme. * * * There is no difference between those
who form the design and those who afterwards enter into
it with a knowledge of its character, and aid in carrying
it out. The grantee is also bound by the acts of his agent
which he adopts and confirms, and, if they are fraudulent,
his own innocence will not suffice to protect the transfer."

Other authorities might be cited showing that notice to
the agent while acting in the scope of his authority must
be regarded as notice to the principal, but these are regard-
ed as sufficient. I will, however, call attention to a portion
of the opinion of Cabell, J., in the case of *French* v. *Loyal
Co.*, 5 Leigh 658. He says: "But although the law in
many cases imputes notice to a man on evidence far short
of that which, if its weight only were considered, would be
necessary to prove actual notice, yet, if we attend to the
nature and character of the facts which the evidence in such
cases does establish, we shall see that the law in imputing
notice acts with its usual justice and equity. Thus on proof
of notice to an agent, the law at once imputes notice to the
principal, not because notice to the agent is proof that the
principal actually had notice also, but because it is a fact of
such a character that the principal ought to be as much
bound by it as if he had notice." See, also, *Newlin* v. *Beard*
6 W. Va. 111, and *Fidelity Ins. T. & D. S. Co.* v. *Shenandoah
Val. R. Co.*, 32 W. Va. 244 (9 S. E. Rep. 180) where this
Court held that notice to a trustee was notice to a *cestui que
trust*, etc.

Now, all these authorities, when applied to the facts and
circumstances of this case, preclude the defendant Letitia
Noe from denying, that she had notice of the fact, that G.
W. Sandy was indebted to the plaintiffs in the sum of five
hundred and eighty dollars, and that he had agreed to exe-
cute a deed of trust upon the property she purchased from
him to secure the payment of said sum, and, although said

about the conveyance of the land to Goff, but his transaction was wholly with Cline.   Thus the conveyance to Goff from Bowman created in Goff not an absolute estate in the eyes of equity, but an equitable mortgage to secure Goff his loan with right of redemption in Cline.   *Ferguson* v. *Bond, supra,* p. 561 (20 S. E. Rep. 591);  *Vangilder* v. *Hoffman,* 22 W. Va. 2.   Bowman had no longer any interest in the land which creditors could subject.   He had not had since January 1, 1883.   If Cline and Goff do not falsify, such is unalterably the state of the case as to these lands.   There is not a bit of evidence to contradict them in this matter.   Can we arbitrarily reject their evidence, when there is not even a cross-examination to impugn it?

Several witnesses were examined on the plaintiff's side, but their evidence only tends to show that Goff was not pecuniarily able to raise money to make this loan and the loan of Bowman of three thousand six hundred and fifty six dollars and ten cents for which the deed of trust and judgment were given.   Let us concede, that he was not able to do both, yet he may have been able to lend this five hundred dollars.   And if—as I do not think we can—we could look to the case of *Bank* v. *Bowman,* 36 W. Va. 655 (14 S. E. Rep. 989) we would find that debt was never claimed to be wholly a loan by Goff to Bowman, but the larger part from a gift to Goff's wife by Bowman in years gone by.   Anyhow it is clear not only from witnesses for Goff but even from witnesses for the bank, that Goff was worth from two thousand dollars to three thousand dollars, was a good farmer, raised and sold cattle, engaged very considerably for years in logging and lumbering, was an active, hardworking, saving man and of honorable character.   Why is it improbable that he made the loan of five hundred dollars?   We have positive evidence by two undisputed witnesses, that he did make this specific loan ;  and his state and condition as proven by other witnesses lend corroboration to their evidence.   A circumstance cited against the fairness of the transaction is, that when Cline paid this purchase-money debt to Bowman with only five hundred dollars there was due six hundred and twenty one dollars ; but this is not certain, for we do not know as a matter of fact, that

several payments had not reduced it. It is said that though this deed was made Decemebr 2, 1887, it was not put on record till February 27, 1888. Sometimes withholding a deed from record may be a circumstance of fraud, but it would seem rather the reverse here, for we would suppose, if sedate fraud was intended, the party would hasten to put it on record. Failure to record is often owing to mere neglect and procrastination. Bowman's deposition is not in the record. It may be that in urging payment of this debt by Cline he intended to get it out of the way of creditors, but that does not convict Goff of fraud in lending Cline money to pay, or Cline in paying it to Bowman. The fact that the deed from Bowman to Goff was only a mortgage is confirmed by a writing found in the record, which both Cline and Goff say was executed, dated March 27, 1888, by which Goff sold this land to Cline for five hundred dollars, and was to deed the land to Cline on payment of purchase-money. This simply attests in writing what had been orally agreed. The relationship of Bowman and Goff does call for explanation as argued, but the evidence of a disinterested witness (Cline) supported by Goff's furnished fair explanation. Were it simply a conveyance by Bowman to Goff, it would wear a different hue; but it is a loan by Goff to Cline to pay Bowman purchase-money under a sale from Bowman to Cline years before any trouble—a fact not disputed, nor capable of disputation. So I conclude that the court below did not err in refusing to hold the land liable.

It is argued, but not apparently with confidence, that the court erred in the dismissal of the bill in this further respect; that the bill charges that Stone had carried on the mercantile business and had large sums of money due him upon notes and accounts, which he was concealing from creditors, amounting to about six thousand dollars, and, as it was taken for confessed by Stone, the bill as to this matter should not have been dismissed. The bill was too indefinite in this matter to warrant a decree upon it taken alone. What sort of a decree could have been pronounced upon it? I doubt whether there could have been a personal decree against Stone for the specific sum of six

thousand dollars; but a personal money decree is not the one aimed at, or which would be warranted under the bill, as it contemplates an ascertainment of debtors of Stone, and pursuit of funds in their hands, as it prayed that Stone turn over the notes and accounts, that they might be collected. This being so, there is no basis for such a decree. Who are the debtors of Stone, and what amounts do they owe? We know not. There is not a particle of evidence to answer these questions. It is a bill of discovery stopping short of discovery. Why did not the plaintiff compel a discovery? Why not compel an answer and the production of notes and accounts? It does not even put Stone on the stand to disclose the debts or furnish any evidence.

Another assignment of error is that the witnesses left the place of examination before 6 o'clock P. M., and plaintiff's counsel had no opportunity to cross-examine them. The notice fixed the hours for taking the depositions between 6 A. M. and 6 P. M. The examination by defendant began at 10 o'clock, A. M., and was concluded at 11:30 A. M., and at 5:35 P. M. plaintiff's attorney appeared to cross-examine; but the witnesses had gone. A reasonable opportunity was given. The counsel showed no diligence to secure his cross-examination. No excuse for the negligence is given. The court could order a cross-examination had it been asked, if there had been any fair excuse by counsel for not having availed himself of the opportunity of cross-examination. These considerations conduct us to an affirmance of the decree.

# CHARLESTON.

MINEAR et al. v. TUCKER COUNTY COURT.

Submitted September 13, 1894.—Decided December 15, 1894.

1. COUNTY-SEAT—RE-LOCATION.
　　Where on petition to the County Court by the requisite number of legal voters an election has been ordered and held to determine

the question of re-locating the county seat under section 15 of chapter 39 of the Code, and the County Court has ascertained its result and declared, that three fifths of the votes cast are in favor of re-location at a particular place and has entered the fact in its record-book, this place is from the date of said declaration by operation of law the county-seat.

2. Elections.

The return of a poll by commissioners of an election is *prima facie* the true result of the election and will not be reversed by this Court because of misconduct on the part of the election-officers or other persons, unless it plainly appears that such misconduct changed the result of the election.

3. Elections.

It is not necessary, that it should appear affirmatively on the record, that all the directions of the statute in reference to posting a copy of the order directing the election to be held at each and every precinct in the county or as to publishing a copy of such order in a newspaper *etc.*, have been complied with. If it appears, that the County Court with the poll-books, tally sheets and certificates of election from the various precincts before it has canvassed the returns and declared the result, it will be presumed to have acted rightly, unless the contrary is made to appear.

4. Elections.

Where the commissioners of a county meet as a canvassing board five days after an election for the sole purpose of declaring the result of said election, counting the vote *etc.*, no notice as to the object of said meeting is required to be posted, as is necessary when special sessions are to be held for other purposes.

A. B. Parsons for plaintiffs in error cited Code, c. 39, s. 6, 15 ; Const. Art. VI, s. 39 ; 75 Mo. 340 ; 21 Ohio St. 11 ; 7 Laws R. and Rem. § 3758, 3760 ; Am. Dig. 803, 806 ; 50 N. W. Rep. 720 ; 29 Kan. 565 ; 3 W. Va. 588 ; 6 W. Va. 74, 612, 640, 720 ; 25 W. Va. 324 ; 27 Stim. 604 ; Stim. Am. Stat. L. § 301 ; 25 Neb. 674 ; 20 Tex. 782 ; 73 Am. Dec. 213 ; 66 Mo. 442 ; 29 W. Va. 63 ; 11 Cal. 49 ; 27 W. Va. 244 ; 18 S. E. Rep. 8 ; Code, c. 3, s. 67 ; Cool. Const. Lim. 603.

A. Jay Valentine, J. P. Scott, A. M. Cunningham *and* A. G. Dayton, for defendant in error :

I.—*Sufficiency of petition—Date.*—Code (1891) c. 39, s. 15 ; 28 W. Va. 181, 182.

II.—*Number of petitioners—Court will take judicial notice of number required.*—29 W. Va. 63 ; 45 N. W. 854 ; 54 Ia. 340.

III.—*Irregularities will not defeat the popular will.*—6 W. Va. 613 ; 23 Tex. App. 77 ; 85 Ky. 597.

IV.—*Separate certificate of return.*—Code (1891) c. 39, s. 15.

V.—*Special law, statutes, titles, etc.*—1 Tuck. Comm. (Ed. 1846) 11; 22 Am. & Eng. Ency. Law 904, note 2; 29 W. Va. 87; 18 S. E. Rep. 470 ; Const. Art. VI., sec. 30; 37 W. Va. 811 ; 7 L. A. R. ; 107 U. S. 147.

VI.—*Failure of officers to be sworn, etc.*—6 W. Va. 613 ; 29 W. Va. 89; 12 Cal. 352; 29 Ill. 54 ; 10 Ia. (With) 212.

VII.—*Regularity of election is presumed.*—6 W. Va 613 ; 29 W. Va. 63 ; 6 Am. & Eng. Ency. Law 326; 19 S. E. Rep. 557.

VIII.—*Sufficiency of notice of special session*—Code (1891) c. 13, s. 13; 21 W. Va. 777.

IX.—*Court house not a vested right.*—29 W. Va. 63; 4 Greene (Iowa) 60.

ENGLISH, JUDGE :

This writ of error was awarded on the petition of A. C. Minear and others to an order made in vacation by the judge of the Third judicial circuit on the 26th day of July, 1893, refusing to award a writ of *certiorari* against the County Court of Tucker county requiring it to *remove* the record of the proceedings in relation to the re-location of the county-seat of said county at Parsons, as specified in the petition, and to produce the same before the Circuit Court of said county, and to abide by and perform any order of said court, that might be made in relation thereto. The only error assigned and relied on by the plaintiffs in error is the refusal of said judge to award said writ of *certiorari*.

It appears from the record of the proceedings of said County Court, which was presented with the petition for said writ of *certiorari* to said judge in vacation, that at a regular session of the County Court of said county of Tucker held on the 4th day of January, 1893, petitions were filed by J. S. Heaton, A. H. Bonnifield, Joseph Fauley, A. J. Valentine, J. W. Runner, J. W. Johnston, C. L. Griffith and six hundred and sixty three other citizens and legal voters of the county of Tucker and state of West Virginia,

desiring the re-location of the county seat to be at the town of Parsons in said county, said petitions being severally verified by the affidavits of Ward Parsons that he verily believed that all the subscribers to said petitions were legal voters of said county, and it appearing that two fifths and upwards of all the legal voters of said county, as estimated by allowing one vote for every six persons in said county as shown by the last census of said county, it was ordered that a vote be taken upon the question of the proposed re-location at Parsons, Tucker county W. Va., at a special election to be held on the 28th day of April, 1893, and provided for the copies of the order being certified to the respective voting places in said county by the clerk, and for posting one of said copies at each of said places of voting at least forty days before the election, and that a copy of said order be published in some newspaper printed in said county once in each week for four successive weeks before said special election; also providing what words should be written or printed on the ballots used at said election, and also providing that said vote should be taken superintended conducted and returned to the clerk of the County Court within the same time that they are required by law to deliver the result of the election of officers, and that said clerk should lay the same before the County Court at its next session thereafter; and that the said court should thereupon ascertain and declare the result of said vote, and enter the same of record. In compliance with said petitions said County Court fixed and ordered a special election to be held on the 28th day of April, 1893, upon the question of the re-location of the said county-seat, proper bond in the penalty of five thousand dollars having been given and acknowledged by the proper parties conditioned to pay all the legal costs of holding said election as required by law.

At a special session of the County Court of said county, held on the 4th day of May, 1893, the vote on said election was canvassed, and, it appearing to the court that three fifths and upwards of all the legal voters of said county of Tucker were cast in favor of removal of county-seat from St. George to Parsons, it was therefore declared carried, whereupon A. C. Minear tendered a bill of exceptions to

the action of the County Court in declaring the result of said election : (1) because the act of the legislature of West Virginia (section 15 of chapter 39 of the Code of 1891) is unconstitutional and void ; that the legislature had no right to authorize a special election to be held for the purpose of re-locating any county-seat; that the said act is clearly and unquestionably against the spirit and intent of section 39, Art. VI, of the Constitution of the state of West Virginia ; —(2) because the ballots received from the commissioners holding the said election at the following places, to wit : Precinct No. 1 in Black Fork district, where there were two hundred and sixty three votes cast for removal, and precinct No. 1, Fairfax district, where there were one hundred and ninety nine votes cast for removal of said county-seat to the town of Parsons, and precinct No. 2 in Dry Fork district, where there were twenty one votes cast for the removal of said county-seat to the town of Parsons—were not endorsed across the seal of the envelope or package containing the said ballots by the said commissioners of election at said voting places, as required by section 67 of chapter 3 of the Code ;—(3) because the commissioners of election and clerks at precinct No. 2 in Black Fork district were not sworn as required by section 11, c. 3, of the Code ; —(4) because the clerk of the Circuit Court of said county failed to have published in two newspapers within the county the question to be voted on at said election for ten days before said election ;—(5) because no place was designated in the notice given by the court for holding the election in Black Fork district at precinct No. 1; that the same was left blank ;—(6) because the notice as required by section 6 of chapter 39 of the Code for holding special sessions of the County Court was not posted the two days before the said session of court as required by law.

The errors in the action of the County Court relied upon in the petition for the *certiorari* were, first, that the petition for the re-location of the county-seat was not presented till the 4th day of January, 1893, and that said petition or petitions were gotten in the year 1892, and were informal and insufficient for the said court to order the said special election ; but, as one of said petitions appears

to have been signed the 31st day of December, 1892—only four days before it was presented—and as this portion of the assignment is not insisted on in argument, my conclusion is that it is not seriously relied upon. It is, however, insisted that the petitions do not conform to the statute, in that they do not conclude with a prayer that the County Court should make an order, that a vote should be taken at a special election to be held in the county upon the question of the re-location of the county-seat at the place named in said petition. By referring to the petition, however, we see that the petition was addressed to the County Court of Tucker county, and is as follows: " We, the undersigned, citizens and legal voters of Tucker county, West Virginia, do most respectfully petition your honorable body for a re-location of the county seat of said county at the town of Parsons, in said county, and to this end we ask that your honorable body fix a day for, and order the holding of, a special election upon the question of such re-location, in accordance with the provisions of section 15 of chapter 39 of the Code of West Virginia." This petition was signed by two fifths of the legal voters of said county, as appears by the affidavit of Ward Parsons appended thereto and by the order of the County Court entered, when the same was filed. We think it conforms to the statute and must be regarded as sufficient.

The third assignment of error is: "Because the clerk of said court did not, as required by law, so far as the record shows, certify any copy of the said order directing the said vote on said question to be taken, as petitioners were informed ; nor were the copies of said order posted by the sheriff for forty days, as the said order required ; and because the record nowhere shows that said order, as the same required, was printed for four successive weeks in some newspaper printed in Tucker county."

Now, while the record does not show affirmatively that the order directing said vote on said question was posted and published as directed by the statute, yet it does appear by an order entered by the County Court of said county on the 23rd day of May, 1893, that at the special election held on the 28th day of April, 1893, upon the ques-

tion of the re-location of the county seat of Tucker county, the legal cost of conducting, superintending, advertising, certifying, and declaring the result of said election amounted to the sum of three hundred and fifty seven dollars and ninety cents, as ascertained by the court; so it appears that a considerable expense was created in advertising, conducting, superintending, certifying and declaring the result, which was audited by the court; and in the order immediately following, which was entered on the 10th day of July, 1893, that it appeared to the court from the order made on the 4th day of May, 1893, at a special session of said court, at which session it canvassed, ascertained and declared the result of the vote of the special election held on the 28th day of April, 1893, on the question of re-location of the county-seat at the town of Parsons for the county of Tucker, and it appearing to the court that three fifths and upwards of all the legal votes of said county cast at said election were cast in favor of removal of the county-seat from St. George to Parsons, it was therefore declared carried. And when we refer to said order of the 4th of May, 1893, we find that it appears on the face of said order that "the clerk in whose custody the ballots, poll-books, tally-sheets, and certificates of the special election held on the 28th day of April were placed, on that day filed the same before the court for examination, and the court, in compliance with section 68 of chapter 3 of the Code proceeded to count the ballots, giving the number of ballots cast at each precinct, declaring the number of votes cast for re-location and against re-location of the county-seat, and ascertained that three fifths and upwards of all the legal votes of said county of Tucker were cast in favor of removal of the county-seat from St. George to Parsons, and that it was therefore declared carried."

Now, in the case of *Hamilton* v. *Court*, 38 W. Va. 74 (18 S. E. Rep. 8) BRANNON, Judge, delivering the opinion of the Court, says: " Now, when such an election has been held, and the County Court has ascertained its result, and declared that three fifths of the votes cast are in favor of re-location at a particular place, and entered the fact in its record book, this place is, from the date of said declara-

tion, by operation of law, the county-seat. It is the duty of the County Court to expressly declare it the county-seat, but that is directory in the statute, and if it has declared the result of the election, and that the requisite three fifths vote is in favor of re-location at a particular place that alone in law removes the county-seat to the new place; otherwise the popular will would be defeated. The statute plainly means that if three fifths of the voters vote for the re-location, and it be so found and declared, and entered by the County Court from that date, the date of such declaration, the new point is the county-seat. In one clause the statute provides for the ascertainment by the County Court whether a three fifths vote has been cast for re-location, and by another clause it enacts that, if such vote has been cast, the place receiving such vote shall thenceforth be the county-seat. It is the vote when so ascertained to be a three fifths vote that works the change. All else is directory or ministerial."

It is not necessary, that it should appear affirmatively on the record, that all the directions of the statute in reference to posting a copy of the order directing the election to be held at each and every precinct in the county, or as to publishing a copy of such order in a newspaper, *etc.*, have been complied with. If it appears that the County Court, with the poll-book, tally-sheets and certificates of election from the various precincts before it, has canvassed the returns and declared the result, it will be presumed to have acted rightly, unless the contrary is made to appear.

This Court held in the case of *Dial* v. *Hollingsworth, supra,* p. 1 (19 S. E. Rep. 557) that the return of a poll by the commissioners of election is *prima facie* the true result of the election, and will not be reversed by this Court because of misconduct on the part of the election officers or other persons, unless it plainly appears that such misconduct changed the result of the election.

Although A. C. Minear, a citizen and taxpayer, on behalf of himself and all other citizens and taxpayers of said county objected to the said Court certifying and declaring the result of said election, and that a majority of said votes so cast be counted, and asked that the same be rejected

upon the grounds hereinbefore stated as set out in said bill of exceptions, yet there was no proof in the cause to sustain the grounds set forth in said bill of exceptions, and hence we hold that said assignment of error was not well taken.

The fourth assignment of error is: "Because the commisssioners of election did not make out and sign and return separate certificates of the result of said election." The answer to this assignment of error is that the vote upon this question was not taken at a general but at a special election held for the sole purpose of ascertaining the will of the voters of said county upon the single isolated question, as to whether the county-seat of said county should be re-located; and, this being the only result to be declared or ascertained by the election, there was no other result to certify, and for that reason the certificate was a separate certificate of the result.

It is next contended and assigned as error, that the action of the County Court was unwarranted, because the act of the legislature of West Virginia (section 15 of chapter 39 of the Code of 1891) is unconstitutional and void, and that the said act is contrary to and against the spirit and intent of section 39 of Article VI of the Constitution of this state, and because the object and purpose of said act of the legislature were not expressed in the title to said bill, as required by the constitution, and it is therefore void for that reason.

Is said section unconstitutional and void because contrary to and against the spirit and intent of section 39 of Article VI of the Constitution of this state, which provides that the legislature shall not pass local or special laws in any. of the following enumerated cases—that is to say, among others, "locating or changing county-seats?" Now, this proceeding was not under any special law but under a law, which would have to be brought into requisition and proceeded under in any county in the state, in which an attempt was made to re-locate the county-seat.

Anderson in his Dictionary of Law "Judicial Definitions," *etc.* says under the word "Statute": "A general or public statute; an universal rule that regards the whole

community.    Local statute applies to citizens of a part of the state, *etc.*    Special or private statute :    This is rather an exception than a rule, being that which operates only upon particular persons and private concerns." See 1 Tuck. Comm. p, 11.

This question was discussed by GREEN, J., in the case of *Welch* v. *County Court*, 29 W. Va. 87 (1 S. E. Rep. 337). He quotes from section 15 of chapter 39 :    "Whenever the citizens of any county desire the re-location of their county-seat, they may file a petition," *etc.*    The section then prescribes the details of the manner in which a county-seat may be re-located by a vote of the people of the county, and says:    "This language is as broad and comprehensive as it can well be, and its terms apply to all counties." There can be no question then but that this statute must be considered general, and not special.

It is also contended that this act. is unconstitutional and void, because the object and purpose of said act of the legislature was not expressed in the title to the said bill as required by the constitution.    When we turn to the title of the bill, we find it reads as follows:—"Concerning the County Courts, their jurisdiction and power ;" and, referring to said section 15, we find it provides for the jurisdiction and powers of the County Court in reference to directing an election, when a proper petition is presented to it praying a re-location of the county-seat ; so that we must hold that the object and purpose of said act was expressed in said bill as required by the constitution.    On this point, see a decision of the Supreme Court of Pennsylvania reported in 18 Atl. 993 (Appeal of Borough of Millvale) where it is held :—"If the title fairly gives notice of the subject of the act, so as reasonably to lead to an inquiry into the body of the bill, it is all that is necessary ; it need not be an index to its contents."

The sixth assignment of error is, that the ballots received from the commissioners holding the election in certain places, where majorities were given for removal, were not indorsed across the seal of the envelope or package containing the said ballots by the commissioner of election at said voting places, and because the commissioners of elec-

tion and clerk at precinct No. 2, Black Fork district, were not sworn as required by section 11 of chapter 3 of the Code ; also because the said election was not conducted as provided in the order of January 4, 1893, at the regular term of the court, or as provided by the general law (Code, c. 3) known as the "Australian Ballot System."

The answer to these objections assigned as error is, that no such facts are disclosed by the record, and there is no proof, that such defects in the proceedings exist, and for the same reason there is nothing before the Court to enable us to pass upon the questions raised by the seventh and eighth assignments of error as to publishing notice in two newspapers within the county of the question to be voted on at the said election, and as to whether any place was designated in the notice given by the court for holding the election in Black Fork district, in precinct No. 1, or in any of the other districts in Tucker county.

The ninth assignment of error is claimed to consist in the fact, that the notice required by section 6 of chapter 39 of the Code for special sessions of the County Court was not posted for two days before the said session of court, as required by law, and because the order entered on the 4th day of May, 1893, at the special session does not state the purpose for which said special session in obedience to said notice was called. This we do not regard as necessary, for the reason that under section 68 of chapter 3 of the Code it is provided that commissioners of the county shall be *ex officio* a board of canvassers. They shall convene as such canvassing board at the court-house on the fifth day (Sundays excepted) after every election held in their county or in any district thereof, and the officers, in whose custody the ballots, poll books, *etc.*, have been placed, shall lay the same before them for examination, *etc.* The statute requires, that they shall meet as a canvassing board on the fifth day, *etc.*, and no notice is required, as when they meet in special term to transact other business.

The tenth and last assignment of error is, that the court-house of said county was located on the lands of Enoch Minear, on the east side of Cheat river, by an act of the legislature of the state of Virginia passed March 7, 1856,

and that the present county-seat at St. George was located on its present site by agreement of proper parties to the contract between the County Court by its commissioners and the people, who by said contract and act agreed, that the said county-seat should be permanently located at St. George, the present site. Now, if this error could be sustained, no county-seat could be re-located under the statute, for the reason that all of them have been located by act of the legislature, and uniformly the site for the court-house building is fixed by agreement between the County Court and the owners of the land; and again, in this instance, the majority of the voters of Tucker county seem to have determined, that they want the court-house located now at Parsons, and, if it depended upon the voice of the people, it has been properly located by their votes.

For these reasons my conclusion is, that the judge of the Third judicial circuit committed no error in refusing to award said writ of *certiorari;* and the order complained of must be affirmed with costs and damages.

# CHARLESTON.

## ROUSH *v.* MILLER.

Submitted June 22, 1894.—Decided December 15, 1894.

1. LIEN—PURCHASE-MONEY—DOWER.

As long as the legal title to land is retained, a lien for the purchase-money exists; and such lien is paramount to the right of dower of the widow of the purchaser.

2. LIEN—PURCHASE-MONEY—DOWER.

Where a conveyance of the legal title to such purchaser is made in pursuance of the agreement of the parties, in order that the purchaser may by deed of trust made at the same time pass on the title to the trustee in the trust-deed to secure the payment of such purchase-money to the *cestui que trust,* who has paid it for him, the two deeds are to be treated as parts of one and the same transaction made to retain on the face thereof a lien on the land for such unpaid purchase-money; and the right of dower of the widow of the purchaser is subordinate to the lien of the deed of trust.

3. LIEN—PURCHASE-MONEY.

> It is but another mode of expressly reserving on the face of the two conveyances treated as one transaction a lien for such unpaid purchase-money. See the case for statement of facts, to which the principle is applied, and out of which the point arises.

TOMLINSON & WILEY for appellant, cited 28 Atl. Rep. 81; Code, c. 65, s. 3; 4 Kent. Comm. 39; 4 Leigh 30; 12 Leigh 264; 2 Rob. 384; 29 Gratt. 99; 31 Gratt. 791; 79 Va. 504; 78 Va. 88; 87 Va. 444; 55 Ia. 244; 20 Ill. 53; 14 Mass. 351; 85 N. C. 456; 9 Ohio St. 331; 13 Ohio 148; 38 Md. 270.

J. B. MENAGER for appellee, cited 11 Gratt. 441; 19 W. Va. 179; Rob. El. Law § 92.

HOLT, JUDGE:

The question involved is: Is plaintiff, Mrs. Mina E. Roush, widow of Peter E. Roush, deceased, entitled to dower in the tract of land of fifty seven acres bought by Roush at a judicial sale and conveyed to him by H. R. Howard, special commissioner? The Circuit Court of Mason by decree entered on the 20th day of February, 1894, held her to be entitled to dower and ordered it to be set apart to her, and from this defendant Miller obtained this appeal.

The facts out of which the point of law involved must arise are as follows: On the 13th day of October, 1888, H. R. Howard, as special commissioner, acting in pursuance of a decree sold the tract of fifty seven acres to Peter E. Roush for the price of one thousand and thirty six dollars of which sum he paid in cash two hundred and fifty nine dollars. This sum he borrowed from defendant C. C. Miller giving his note therefor with his father, A. J. Roush, as surety. But no question is involved as to this; it is only mentioned as one of the circumstances of the transaction. For the residue Roush, the purchaser, executed to Howard, the commissioner, his three several bonds for two hundred and fifty nine dollars each payable in one, two and three years with interest from date. By decree entered on the 23d day of October, 1894, the sale was confirmed, and Roush was put into and retained actual possession, and

Howard was appointed a commissioner to make him a deed on payment of the unpaid purchase-money. When Roush applied to defendant Miller in September, 1888, to borrow two hundred and fifty nine dollars, the cash payment, he asked defendant Miller to take a deed of trust on the land for the entire amount which he expected to bid, as the proceeds of sale to the extent of something over one thousand four hundred dollars was going to Miller, as the sum decreed him. This Mr. Miller declined to do, but he afterwards agreed, if Roush would give him a note with Albert J. Roush, his father, as surety for two hundred and fifty nine dollars, that he would take a trust-deed on the land for the balance of the purchase-money, provided he did not bid beyond the value of the land. On the 22d day of December, 1888, the principal and interest on the Roush notes amounted to seven hundred and eighty six dollars and six cents, and on that day Miller gave Commissioner Howard a receipt for that amount of the sum decreed to be paid to him out of the proceeds of sale. In consideration thereof Commissioner Howard gave up to Roush his purchase-money notes as paid and made him a deed for the land; and Roush in consideration of what Miller thus settled for him, executed to Miller his note for the same, and with his wife, the present plaintiff, executed a deed of trust to Rankin Wiley, trustee, on the fifty seven acres, to secure the payment of the note given by Roush to defendant Miller. This was all done on one and the same day without any money passing between any of the parties. But the wife, Mina E. Roush, being but nineteen years old at the time, it is conceded, that her joining in the execution of the deed of trust had no efficacy, as the case stands, in barring any right of dower she might have had. Peter E. Roush died on the 14th day of September, 1893, intestate, leaving his wife, Mina E., the plaintiff, and one child, his infant daughter, Bertha G. Roush. In October, 1893, Mina E. Roush instituted this suit claiming dower in the tract of land of fifty seven acres praying that dower be assigned to her. Defendant Miller demurred to and answered the bill, but the court overruled the demurrer and being of opinion that plaintiff was entitled to dower,

testimony upon said points, the court may at a subsequent term set aside the order sustaining said demurrer.

6. INSURANCE—NEW TRIAL.

Where a demurrer thus sustained has precluded the plaintiff from introducing material testimony upon the trial, and the court, having discovered the error, sets aside the verdict of the jury, and awards a new trial upon that ground, this is not error.

W. P. HUBBARD for plaintiff in error cited 31 W. Va. 851; Code, c. 125, s. 11; 21 W. Va. 577; 25 W. Va. 667; 3 W. Va. 540; Code, c. 125, s. 66; 5 Am. & Eng. Ency. L. 562; 1 Rob. (old) Prac. 638; 151 U. S. 462, 463, 468; 6 T. R. 710; 1 Ben. F. Ins. Cas. 53; 10 Allen 213; 8 Exch. 819; 28 Law J. Q. B. 260; 41 Pa. St. 164; 57 N. Y. 500; 35 W. Va. 666; 10 W. Va. 507; 8 W. Va. 474; 90 Mich. 302; 133 N. Y. 356; 32 Neb. 750; 48 Kan. 239; 51 Minn. 239; 43 N. H. 621; 18 Wis. 387; 2 Gray 480; 12 Gray 535; 36 Minn. 433; 64 N. Y. 162; 52 N. Y. 502; 2 Ins. L. Jour. 769; 57 N. Y. 500; 3 Ins. L. Jour. 771; 109 Pa. St. 535; 141 Pa. St. 10; 1 Ben. F. Ins. Cas. 53; Id. 264; 2 Pet. 25; 1 J. S. Green 110; 1 Ben. F. Ins. Cas. 389; 112 Mass. 41; 87 Pa. St. 399; 63 Pa. St. 9; 2 May § 471, 508; 11 Am. St. 67; 10 W. Va. 553; 50 Minn. 231; 60 Ia. 704; 128 Pa. St. 392; May Ins. § 462; 8 Gray 33; 21 W. Va. 368; 11 S. E. Rep. 50; 35 W. Va. 666; 57 Vt. 520; 6 Bis. 91; 33 W. Va. 526; 21 W. Va. 368; 25 Wend. 382; 3 Gill. 176; 2 Ben. F. Ins. 405; 10 W. Va. 541; 98 Mass. 420.

CALDWELL & CALDWELL for defendant in error:

I.—*Failure to furnish proof of loss within thirty days does not bar recovery.*—93 Mich. 81; 102 Pa. St. 284; Wood F. Ins. § 416; 80 Ill. 394; 134 Pa. St. 588; 51 N. H. 55; 33 W. Va. 676; 2 Wood F. Ins. § 443; 39 N. J. L. 482.

II.—*Proof of loss furnished with reasonable diligence*—90 K'y 241; 87 Ill. 70; 14 Mo. 220; 3 Neb. 391; 76 N. Y. 459; 80 N. Y. 108.

III.—*Waiver of proofs of loss.*—21 W. Va. 383; 37 W. Va. 786; 10 W. Va. 560; 11 R. I. 139; Id. 583; 57 Mich. 21; 8 Exch. 819; 8 Johns. 317; 11 Johns. 259; 23 Wend. 526; Flound. F. Ins. 529; 86 Ala. 424; 102 Pa. St. 94; 1 May Ins. (3d Ed.) §§ 174, 175; 2 Wood F. Ins. § 482; 37 W. Va. 795; 10 W. Va. 567.

85

IV.—*Proofs of loss in this case an idle ceremony.*

V.—*Plaintiff justified in waiting to make proofs of loss.*—35 W. Va. 673 ; 41 Md. 60 ; 2 Wood F. Ins. § 443 ; 11 R. I. 139.

VI.—*Meaning of the word adjustment.*—116 N. Y. 54 ; 12 W. Va. 116 ; 37 W. Va. 794 ; 35 W. Va. 673 ; 154 Pa. St. 384 ; 26 Atl. 14 ; 80 N. Y. 109 ; 115 Pa. 407 ; 64 Mich. 372 ; 61 Mich. 635 ; 112 Ill. 69 ; 81 N. Y. 419 ; 43 Wis. 109 ; 7 Lawy. Ann. 82.

VII.—*Court could set aside at a subsequent term its order sustaining demurrer.*—2 Black Judgmts. § 509 ; 82 N. Y. 555 ; 1 Whar. Ev. 781 ; 36 Ia. 526 ; 1 Bl. Jdgmts. § 29 ; 76 N. Y. 514 ; 16 Am. & Eng. Ency. L. 511 ; 38 Kan. 224.

VIII.—*Declaration or plea with statements "filed in aid of" them are pleadings.*—21 W. Va. 576 ; 31 W. Va. 853 ; 33 W. Va. 526.

IX.—*Evidence that other companies had paid their share of loss admissible.*—31 W. Va. 430.

X.—*What defendant's bill of exceptions should have contained.*—31 W. Va. 430 ; Code, c. 131, s. 9.

XI.—*Costs of former trial should abide event of new trial.*—Code, c. 138, s. 5.

XII.—*Order in this case granting plaintiff new trial should not be reversed.*—10 W. Va. 115 ; 31 W. Va. 428 ; 12 W. Va. 116 ; 37 W. Va. 796.

ENGLISH, JUDGE :

Leon Rheims obtained a policy of insurance from the Standard Fire Insurance Company of Wheeling for one thousand dollars on certain merchandise contained in brick building and on sidewalks adjoining, situate Nos. 5, 7 and 9 Union Square, New York, through to and fronting on Fifteenth street, from the 11th day of January, 1892, at 12 o'clock, noon, to the 11th day of January, 1893, at 12 o'clock noon, subject to the conditions and stipulations of said policy. On or about the 21st day of January, 1892, said merchandise was lost by fire in the city of New York, and on the 10th day of June, 1892, the said Leon Rheims brought an action of trespass on the case in *assumpsit*

against said insurance company to recover the amount of said policy. The declaration is in the short form prescribed by section 61, c. 125, Code, and a copy of the policy was filed with the declaration. One of the conditions of the policy was, that proof of loss should be furnished within thirty days after the fire occurred, and that payment of the policy should be made sixty days after compliance by the assured with the conditions of the policy, and that no suit should be brought for the same, until the assured had complied with the requirements of the policy. In addition to the statutory plea said insurance company stated by way of defence the failure on the part of the plaintiff to comply with certain requirements of said insurance policy, as follows :

"In the Circuit Court of Ohio County, W. Va.

"*Leon Rheims* v. *Standard Ins. Co.* of Wheeling, W. Va.

"The defence in the above case being with other things, that the action can not be maintained because of the failure to perform and comply with and the violation of certain clauses, conditions and warranties in the policy sued on, the defendant here specifies, as the particular clauses, conditions and warranties, in respect to which such failure or violation is claimed to have occurred, the following: ' Third. This entire policy shall become void in each of the following instances, viz: * * * If, any usage of trade or manufacture to the contrary notwithstanding, there be kept, used, or allowed on the above-described premises *. * * rubber cement.' Defendant states that rubber cement was kept, used and allowed on the premises in the policy described.' 'Eighth. Proceedings in case of loss : *. * *. And within thirty days after the fire the assured shall render a particular and detailed statement of the loss and claim in writing, signed and sworn to by the assured, setting forth : (1) A copy of the written portions of this policy, with the indorsements thereon; (2) copies of the written portions of all other policies, whether valid or not, attaching in whole or in part to the property insured hereunder, and of all indorsements thereon; (3) the cash value at the time of the fire of each item of the property, and the amount of loss

claimed thereon; (4) a full and specific account of the nature of assured's interest in and title to the property, and that of all others interested therein; (5) all incumbrances or liens upon the property, or any part thereof; (6) the time, origin, and circumstances of the fire; (7) any change in the title, use, occupancy, location, possession, or exposure of said property since the policy was issued; (8) by whom and for what purpose any parts thereof were occupied at the time of the fire; (9) the amount claimed of this company. And shall also furnish a certificate of the magistrate or notary public (not interested in the claim as a creditor or otherwise, nor related to the assured, nor a sufferer by the fire) living nearest the place of the fire, stating that he has examined the circumstances, and believes the assured has honestly sustained loss to amount claimed. * * * Ninth. No suit or action against the company for the recovery of any claim, by virtue of this policy, shall be sustainable in any court of law or equity until after full compliance by the assured with all the foregoing requirements.'

"W. P. HUBBARD, Attorney for Defendants."

"State of West Virginia, Ohio Co., to wit:

"Personally appeared before me, John W. Mitchell, clerk of the Circuit Court of said county, in my office, E. B. Bowie, who, being duly sworn says on his oath, that he is secretary of the defendant, the Standard Fire Ins. Co. of Wheeling, and that he believes that the matter of defence above stated by the said company will be supported by evidence at the trial of the above-entitled action.

"E. B. BOWIE.

"Taken, sworn to, and subscribed by the said E. B. Bowie before me in my said office this 13th day of Sept., 1892.

"JOHN W. MITCHELL, Clerk of the Circuit Court."

On the 8th day of October, 1892, on motion of the plaintiff, the defendant was required to file an additional statement, which was done, as follows:

"Leon Rheims vs. Standard Fire Insurance Company. In *Assumpsit*. The defendant, to comply with the order of the court made herein on the 8th day of October, 1892, says that it expects to prove at the trial of this action that

the assured did not within thirty days after the fire render any statement in writing of its loss and claim, signed and sworn to by the assured. The assured never furnished a certificate of the magistrate or notary public (not interested in the claim as a creditor or otherwise, nor related to the assured, nor a sufferer by the fire) living nearest the place of the fire, stating that he had examined the circumstances, and believed that the assured had honestly sustained loss to the amount claimed."

This additional statement was sworn to by E. B. Bowie, secretary of said company; and on the 21st day of November, 1892, the plaintiff tendered a demurrer to the plea of defendant with the original statement of defence, and said additional statement filed in aid of said plea and also a demurrer to said statements and each of them, on the ground that they did not nor did either of them set forth any defence sufficient in law to said action; and on the 28th day of January, 1893, the defendant having joined in said demurrer, the same were overruled as to the defendant's plea with so much of the statement filed by defendant in aid of it, as relates to the proof of loss not being furnished within thirty days after the fire; and also overruled the demurrer of the plaintiff to the defendant's plea, with so much of the statements filed by the defendant in aid of it as relates to a certificate of a magistrate or notary public not being filed; and also overruled the demurrer of the plaintiffs to the defendant's plea, with so much of the statements filed by the defendant in aid of it, as relates to the rubber cement being kept, used and allowed.

The plaintiff thereupon filed the following statement:

"Leon Rheims v. The Standard Fire Ins. Co. of Wheeling. In *Assumpsit*.

"The plaintiff, Leon Rheims, files the following statement in writing of matters upon which he intends to rely in waiver, estoppel, and in confession and avoidance of the matters as to furnishing proofs of loss, and the certificate of a magistrate or notary public, stated by the defendant in its statements heretofore filed; that is to say: (1) That the policy sued upon does not expressly make the failure to furnish the defendant the proofs of loss within thirty days after the

fire a cause of forfeiture of the policy and of the claim of the plaintiff. (2) That the policy sued upon does not expressly make the failure to furnish the defendant the certificate of the magistrate or notary public a cause of forfeiture of the policy and of the claim of the plaintiff. (3) That it was provided in the policy sued upon as follows : 'It is hereby understood and agreed that, in case of loss or damage by fire to the property covered by this policy, this company agrees to abide by the adjustment made and accepted by the companies interested belonging to the New York Board of Fire Underwriters;' that the companies interested belonging to the New York Board of Fire Underwriters began such adjustment at once after the fire took place, on the 21st day of January, 1892, and such adjustment was proceeded with with all reasonable diligence until completed, but was not completed within thirty days after the fire ; that as soon as it was completed it was accepted by companies interested belonging to the New York Board of Fire Underwriters ; proofs of loss were prepared in accordance with said adjustment, and mailed from Jersey City, N. J., to the defendant, to wit, on the 9th day of March, A. D. 1892, and received within three days by the defendant by mail in due course, at Wheeling, West Va., to wit, on the 12th day of March, A. D. 1892. (a) That it was impossible to furnish the defendant with proofs of loss, as per that adjustment, until it was completed as aforesaid, and that such proofs of loss were furnished to the defendant as aforesaid as soon as the said adjustment was made, completed, and accepted as above set forth. (b) That the agreement in the policy to abide by the adjustment so made and accepted was a waiver of the furnishing of proofs or loss by the plaintiff to the defendant. (c) That no objections to the proofs of loss have ever been made by the defendant to the plaintiff, and defendant has retained said proofs of loss ever since they were received by it as aforesaid. (d) That the said adjustment could not be and was not completed with reasonable diligence, and accepted by the companies interested belonging to the New York Board of Fire Underwriters, within thirty days after the fire, and that the agreement in the policy sued on, that the

defendant would abide by the adjustment so made and accepted, was a waiver, under the circumstances, of the provision that the proofs of loss should be furnished to the defendant within thirty days after the fire. (4) That the plaintiff did not unreasonably delay furnishing such proofs of loss, but furnished them to the defendant as aforesaid, and that the defendant has in no way been prejudiced by the delay of furnishing the same after the said thirty days as aforesaid. (5) That the agreement of the defendant in the policy sued on, to abide by the adjustment made and accepted by the companies interested, belonging to the New York Board of Fire Underwriters, was a waiver by the defendant of the furnishing of the said certificate of a magistrate or a notary public. (6) That the plaintiff, by his agent, on or about March 9, 1892, notified the defendant as follows: 'The settlement papers are on file with the Home Insurance Company of New York, and if you desire any further information will you kindly address them, or if you will advise us we will obtain it for you.' (e) No such request was afterwards made, nor has any such request or notice or information at any time since said fire been given by the defendant to the plaintiff that such certificate was required, or that the proofs of loss were imperfect, defective, or deficient because such a certificate was not furnished or included in them; and, as to all other allegations contained in the statements heretofore filed by the defendant, the plaintiff denies them to be true.

"LEON RHEIMS."

This statement was also verified by affidavit.

To this statement the defendant demurred, which demurrer was sustained as to portions of said statement, and overruled as to the residue; the court holding that the policy did not expressly make the failure to furnish the proofs of loss within thirty days or to furnish the certificate of the magistrate a cause of forfeiture of the policy, and that by the policy the defendant agreed to abide by the adjustment of companies interested belonging to the New York Board of Fire Underwriters; that such companies began an adjustment at once after the fire, and proceeded with diligence, but did not complete it within thirty days; that

when completed it was accepted by the companies belonging to that board, and proofs of loss were prepared and mailed March 9th; that plaintiff did not unreasonably delay furnishing said proofs, and the defendant had not been prejudiced by the fact that they were furnished after thirty days.

The plaintiff tendered an amended statement, which was objected to by the defendant, and the objection sustained by the court, and by consent said amended statement was made a part of the record, to be considered as if incorporated in a bill of exceptions, which amended statement detailed additional circumstances connected with the transaction accounting for the delay in furnishing proofs of loss, and assigned additional facts in support of his original statement, which on account of its length is not here inserted.

On the 19th day of December, 1893, the case was submitted to a jury, who found a verdict for the defendant, the plaintiff's evidence having been excluded from the jury. The plaintiff moved to set aside the verdict, and award him a new trial, and on the 24th day of March, 1894, this motion was sustained, and the defendant excepted, and applied for and obtained this writ of error.

The first question to which our attention is directed by the petition of the plaintiff in error is : Are the statements provided for by sections 62, 63, and 65 of chapter 125, pleadings or mere notices? Now, the nature and object of these statements are clearly indicated by the statute itself. Section 62 provides that, " if good cause therefor be shown or appear, the court or judge in vacation may order the plaintiff to file a more particular statement in any respect of the nature of his claim, or the facts expected to be proved at the trial and may stay the action until a reasonable time after such order is complied with," *etc.;* and the sixty-third section provides that " in like manner if good cause therefor appear, and there be no unreasonable delay on the part of the plaintiff in applying for such order, the court or judge in vacation may order the defendant to file a more particular statement in any respect of the nature of his defence or the facts expected to be proved at the

trial," *etc.*, both of which statements are required to be verified by affidavit that the same will be supported by evidence at the trial.

Section 64 gives the form of the plea, and further provides that "if in any action on a policy of insurance the defence be that the action can not be maintained because of the failure to perform or comply with or violation of any clause, condition or warranty in, upon or annexed to the policy or contained in or upon any paper which is made by reference a part of the policy the defendant must file a statement in writing, specifying by reference thereto or otherwise the particular clause, condition or warranty in respect to which such failure or violation is claimed to have occurred, which statement is required to be verified," *etc.*

Section 65 provides that upon the plea mentioned in section 64 the plaintiff may join issue without other pleading. But, if the plaintiff intends to rely upon any matter in waiver, estoppel, or in confession and avoidance of any matter which may have been stated by the defendant as aforesaid, the plaintiff must file a statement in writing, specifying in general terms the matter on which he intends to rely, and such statement must be verified, *etc.;* and the affidavit must state that he believes that the matter of reply therein stated will be supported by evidence at the trial.

Section 66 provides that "if either party to such action fail to file any statement required of him by the four preceding sections of said chapter or by the other party pursuant to any of the provisions of the said sections or if the statements be adjudged insufficient in whole or in part, the court as justice may require may grant further time for filing the same, or permit the statement filed to be amended, or may at the trial exclude the evidence offered by the party in default as to any matter which he has so failed to state or has insufficiently stated. But no statement which in the particulars required by or under the said sections to be stated or referred to therein is sufficient to notify the adverse party in effect of the nature of the claim or defence intended to be set up against him shall be adjudged insufficient."

It is apparent, from the language of the statute, that

these statements were authorized and intended to be in aid of the pleadings. A short form for a declaration upon an insurance policy is prescribed in section 61, which is a departure from the common-law pleading in declaring upon insurance policies, having for its object brevity and simplification, and, instead of effecting that object, it necessitates the enactment of the following sections, which allow the court or judge in vacation, for good cause, to require additional statements as to the notice, nature of the plaintiff's claim, or the nature of the facts expected to be proved; and for like cause the court or judge in vacation may order the defendant to file a more particular statement of the nature of his defence or of the facts expected to be proved; and, if the plaintiff intends to rely upon any matter in waiver, estoppel or in confession or avoidance of any matter, which may have been stated by the defendant as aforesaid, the plaintiff must file a statement in writing specifying in general terms the matter, on which he intends to rely; and this is required although he may have joined issue on the plea prescribed in the sixty fourth section, "that he is not liable to the plaintiff as in said declaration is alleged."

These statements must, then, be considered as in aid of the pleadings, and the fact, that section 65 provides that, if the plaintiff intends to rely upon any matter in waiver, estoppel, or in confession and avoidance of any matter which may have been stated by the defendant as aforesaid, he must file a statement in writing, specifying in general terms the matter on which he intends to rely, clearly indicates that these statements must be regarded as informal pleadings; and that the object is to avoid technicality is clearly apparent from the language of the last clause of section 66, which provides that "no statement which in the particulars required by or under the said sections to be stated or referred to therein, is sufficient to notify the adverse party in effect of the nature of the claim or defence intended to be set up against him, shall be adjudged insufficient."

The next question for consideration is whether under the provisions of the policy sued on it is essential to the plaintiff's right of recovery, that he render proofs of loss with-

in thirty days after the fire. It is true that one of the conditions of the policy sued upon is that within thirty days after the fire the assured shall render a particular and detailed statement of the loss and claim in writing, signed and sworn to by the assured, setting forth certain matters therein stated, and, among other things, the amount claimed of the company; and shall also furnish a certificate of the magistrate or notary public (not interested in the claim as a creditor nor related to the assured nor a sufferer by the fire) living nearest the place of the fire, stating, that he has examined the circumstances and believes the assured has honestly sustained loss to the amount claimed; and another condition of said policy provided that "no suit or action against said company, for the recovery of any claim by virtue of said policy, should be sustainable in any court of law or equity, until after full compliance by the assured with all the foregoing requirements, nor unless such suit or action shall be commenced within six months next after the date of the fire," *etc.*

Was the fact, that the proofs of loss were not furnished by the plaintiff within thirty days after the fire occurred a bar to the recovery in this case, and was the want of the certificate of the nearest magistrate waived or cured by the action of the defendant in receiving and retaining the proofs of loss without calling the attention of the plaintiff to the defect; and was it a waiver of its right to object to said proof of loss on that ground? These were questions before the supreme court of Wisconsin in the case of *Vangindertaelen* v. *Insurance Co.*, 82 Wis. 112 (51 N. W. Rep. 1122). In that case the policy provided that notice of the loss should be given within six days, and that proofs of loss should be furnished within thirty days thereafter, and that the loss should be paid sixty days after the proofs were received at the company's office. It was held, that in the absence of a provision to that effect a failure to furnish the proofs of loss within the time prescribed did not operate as a forfeiture of the policy but merely postponed the maturity of the claim; and that the reception and retention of the proofs of loss by the company without objection was a waiver of defects therein. The court in its opinion in that case, among other things, says:

"The policy required the plaintiff to render particular verified proofs of loss within thirty days after such notice of loss—that is to say, within thirty six days after the fire—but the policy nowhere makes the failure to render such proofs within the time named operate as a forfeiture of the policy. To prevent such forfeitures, courts are bound to construe such contracts as strongly against the insurer, and as favorably for the insured, as their terms will reasonably permit"; citing *Kircher* v. *Insurance Co.*, 74 Wis. 473, (43 N. W. 487): "The most that the policy did do in the regard mentioned was to provide that the loss should not be payable until sixty days after such proofs had been received at the Chicago office of the defendant. The delay in furnishing the proofs at that office until December 11, 1890, therefore, merely operated to postpone the maturity of the claim until sixty days thereafter."

A clause in a policy of insurance identical with the one under consideration was construed by the supreme court of Michigan in the case of *Steele* v. *Insurance Co.*, 93 Mich. 81 (53 N. W. Rep. 514) in which case it was held that time is not of the essence of the provision of the Michigan standard fire insurance policy, requiring proofs of loss to be rendered within sixty days after the fire ; and the further provision, that no suit can be brought on the policy "until after full compliance by the insured of all the foregoing requirements, nor unless commenced within twelve months after the fire," refers to the requirements as to notice, proofs and adjustment of the loss, and its intent is to provide that no suit can be maintained, unless commenced within one year after the fire, and in no event until after compliance with such requirements (under the policy, we are considering, within six months).

Again, in the case of *Tubbs* v. *Insurance Co.*, 84 Mich. 647 (48 N. W. Rep. 296) it was held that "failure to make proofs of loss within thirty days, as provided for in an insurance policy, will only operate to postpone the right of action of the assured until the proofs are supplied, where there is no limitation in the policy as to the time within which suit must be brought, nor provision for forfeiture in case proofs are not made within the thirty days."

So, also, in the case of *Association* v. *Evans*, 102 Pa. St. 281, it was held that "provisions in a policy of insurance prescribing a limit of time within which notice of loss is to be given *etc.*, will not be construed as causes of forfeiture, where not so expressly stipulated in the policy"; and that "where a policy provided that notice of loss should be given within twenty four hours after it occurred, but provided no penalty or forfeiture for failure to give such notice, held, that the insured might recover if he gave notice of loss within a reasonable time after he knew it."

In the case of *McMaster* v. *Insurance Co.*, 55 N. Y. 222, the court held, as we think rightly, that "proofs of loss are no part of a contract of fire insurance, nor do they create the liability to pay a loss; they serve to fix the time when it becomes payable, and when an action may be commenced to enforce a liability"; that, "for the purpose of upholding a contract of insurance, its provisions will be construed strictly against an underwriter."

The Supreme Court of Illinois, in the case of *Insurance Co.* v. *Scammon*, 100 Ill. 645, held that a clause in a policy of insurance, that "in case of loss the insured shall give immediate notice thereof in writing, and shall render to the company a particular account of said loss in writing, under oath, *etc.*, where it is further provided that until such proofs and certificates are produced, and examination and appraisal permitted, the loss shall not be deemed proved or payable, does not require that the proof of the loss shall be furnished immediately, as in the case of notice of loss. But the loss not being payable until sixty days after furnishing proof thereof, and the insured being limited by the terms of the policy to one year after loss in which to sue, the insured is required to furnish the proofs within ten months from the loss."

So, also, in the case of *Insurance Co.* v. *Mattingly*, 77 Tex. 162 (13 S. W. Rep. 1016) it was held that proof of loss by the insured is only serviceable as a basis for an amicable adjustment; such proof is useless when the insurer denies all liability under the policy. Proof of loss was furnished the insurer. An officer of the insurance company replied that it was unsatisfactory, and denied liability upon the policy.

Held, whether the letter denying liability was a waiver of further proof of loss was a matter of law, and not of fact, and that a refusal to pay was a waiver of further proof of loss by the insurance company.

In the case of *Insurance Co.* v. *Sheets*, 26 Gratt. 854, it was held that, if the evidence shows that the preliminary proofs required by a policy of insurance have been waived by the company, the insured is entitled to recover, though no such proofs were in fact taken. This we regard as a correct statement of the law.

The court of appeals of Kentucky held, in the case of *Insurance Co.* v. *Downs*, 90 Ky. 236 (13 S. W. Rep. 882) that "where a policy of fire insurance prescribes the various acts or causes which shall work a forfeiture of the policy, and omits to provide that the failure to furnish proofs of loss within the time required by the policy shall operate as a forfeiture, and provides that no suit can be maintained on the policy unless brought within six months after the fire, with a proviso that no action shall be commenced until the conditions of the contract have been complied with, the failure to furnish proofs of loss within thirty days, the time fixed by the policy, does not prevent a recovery. It is sufficent if proofs of loss are furnished before suit is brought." See, also, *Insurance Co.* v. *Meyer*, 39 N. J. Law 482, where it is held that "delay in objecting to formal defects in the preliminary proofs, under the conditions of a policy of insurance, which might be obviated in time to preserve the right of action if made promptly, is evidence of a waiver of such defects."

Upon the question of waiver, Wood on Fire Insurance, at page 832, § 496, says: "When the insurer, knowing the facts, does that which is inconsistent with its intention to insist upon a strict compliance with the conditions precedent of the contract, it is treated as having waived their performance, and the assured may recover without proving performance. * * * So, too, the production of proofs of loss, or defects therein may be waived, and such waiver may be implied from what is said or done by the insurer," —citing *Insurance Co.* v. *Dunmore*, 75 Ill. 14, in which the court held that where formal proofs of loss are made and

tendered to the agent of the company insuring, and refused on the alleged ground that the company is not liable for the loss, this will estop the company from making any formal objections to the proofs when sued on its policy for the loss." Also *Patterson* v. *Insurance Co.*, 64 Me. 500, where it was held that "failure to notify the assured that the proofs of loss furnished by him to the company are insufficient will be deemed a waiver of defects, and the objection can not be made at the trial."

The foregoing authorities and the weight of others we have had an opportunity of examining have a stong tendency to show that the condition in a policy requiring proofs of loss to be furnished in a specified time is to be construed liberally, and the insurer can not defeat the policy on that ground, where strict compliance has been excused or waived by the acts or conduct of the agents of the insurance company. The courts should not, on slight technical grounds, allow an insurance company to avoid its policy; for while it is true that such companies, so long as they comply in good faith with their engagements, give confidence to those having capital to invest, and are of great assistance in promoting the advancement of commerce, yet all must agree that a loss of confidence in these institutions should be regarded as a public calamity.

Now, when we apply the principles asserted in the foregoing authorities to the circumstances disclosed in this case, we find that the policy on its face contained the following stipulation: "It is hereby understood and agreed that, in case of loss or damage by fire to the property covered by this policy, this company agrees to abide by the adjustment made and accepted by the companies interested belonging to the New York Board of Fire Underwriters"; that an adjustment was made, requiring considerable delay, which was satisfactory to said companies, and of them all, in pursuance of said adjustment, as appears by the testimony of W. K. Underhill, the defendant alone refused to pay. The defendant had prompt notice of the loss, and in the same letter the defendant was informed that the loss was being adjusted with the New York companies interested, and as soon as the adjustment was made

proofs of the loss would be forwarded. To this letter no reply was received. When the proofs of loss were sent to defendant, on the 9th day of March, defendant was notified that the settlement papers were filed with the Home Insurance Company of New York, and an offer was made to furnish any desired information. On May 18th the plaintiff's agent wrote to defendant, expressing surprise that the draft for the amount of the policy was returned not paid. On May 21st defendant, through its agent, telegraphed to plaintiff's agents at New York, "Finance committee will act on it next week." After several letters had been sent to the defendant, and ineffectual efforts made to get a response, on the 1st day of June, 1892, plaintiff drew on the defendant at Wheeling a sight draft for one thousand dollars, which was duly presented, but defendant paid no attention to same, except to say to the bank messenger, "Not correct." This was long after the proofs of loss had been received by the defendant without a word of objection, and without designating a single defect therein. The object of the proof of loss ordinarily is to enable the defendant to make a proper adjustment of the loss. In this instance, however, it had agreed to abide by the adjustment of said New York companies, and the proof of loss, however formal in all respects, could have been of no service to the defendant, when the further fact is considered that the proofs of loss were received by the defendant without exception, and when, long after they were so received, and the defendant was urged to pay the amount of the policy as the other companies interested had done, without even then raising any objection to the proofs of loss tendered, it simply informed the plaintiff "that the finance committee would act on it next week," and refused subsequently to pay the plaintiff's draft for the amount, merely answering "Not correct."

These facts were set up by the plaintiff in his additional statements, but the defendant demurred to them, and the demurrer was sustained. By sustaining the demurrer to these statements, the Circuit Court precluded the plaintiff from introducing his testimony tending to show a waiver on the part of the defendant of a strict compliance on the

deed of trust had been prepared and presented to said Sandy for execution, he had refused to execute and acknowledge the same.

In the case of *McVeagh* v. *Baxter*, 82 Mo. 518, it was held that "a creditor can not purchase the goods of his debtor at a price in excess of his debt, when he knows that the excess so paid such debtor is by the latter to be placed beyond the reach of his other creditors; such purchaser is a participant in the fraud of his debtor, whether his purpose be to aid him or not."

The intimate relations between the parties to this transaction were such, that we must conclude, that Samuel Noe was aware of the fact, that G. W. Sandy was arranging his business with the intention of leaving the state, which he did shortly after the sale of his property; and he must have known from his refusal to execute the deed of trust to secure plaintiffs, that he did not intend to pay the plaintiffs' debt. The first note would fall due in July, and he left the state in June without complying with his agreement to secure the plaintiffs' notes. Not only so, he had sold the property on which he agreed to secure them.

Now, again, as to the particularity observed in counting the money and executing the conveyance for the transfer of this property, we find in 8 Am. & Eng. Ency. Law, p. 783, the law is stated thus: "Whenever there appear to be connected with the transaction circumstances indicating excessive effort to give it the appearance of fairness or regularity, and which are not usual attendants of such business, the court and juries are often influenced in favor of the creditor. If parties not usually very exact in their negotiations carry out a transaction with great precision, accurate calculations, and the claim of the grantee made to overbalance the valuation, these, with other facts, will lead the court to believe the transaction is not *bona fide*. Generally, *bona fide* transactions do not need to be clothed with extraordinary pretenses of prompt payment."

So in the case of *Comstock* v. *Rayford*, 12 Smedes & M. 370, it was held that "where it is not necessary to record a bill of sale of slaves, and yet the record of it is made, it looks as though it might have been done for effect," *etc.*

In view, then, of the circumstances detailed by the evidence in this case there can be no question as to the fact, that the sale of this mill and fixtures by the defendant G. W. Sandy to Letitia Noe was made with intent to hinder, delay and defraud the plaintiffs out of their just debt; and it is equally evident, that the defendant Samuel Noe, while acting as the agent of said Letitia Noe, aided said Sandy in carrying out his fraudulent intent and had full notice thereof; and that notice to him under the circumstances was notice to the said Letitia, and said sale and conveyance must be held void as to the plaintiffs' claim.

The appellants assign as an additional ground of error, that "the court should have held, that the express agreement made by Sandy at the time of his purchase of said property to give a trust-deed upon the same to secure them is enforceable in equity against Samuel and Letitia Noe, they having had notice of said agreement at the time of their purchase." But as I have already arrived at the conclusion that said conveyance and sale of said property was made with intent to hinder, delay and defraud the plaintiffs, and that said Letitia Noe had notice of such intent, and said sale was therefore void as to plaintiffs' claim, it is unnecessary to discuss or pass upon the other assignment of error in this case.

The decree complained of is reversed, and the cause remanded, with costs of appellants.